[Civ. No. 8246. Third Dist. July 29, 1953.]

H. MOFFAT COMPANY (a Corporation), Respondent, v.
JOE C. ROSASCO, Appellant.

Vernon F. Gant for Appellant.

C. Ray Robinson, R. Vaughn, W. E. Craven, William P. Boone, Morrison, Hohfeld, Foerster, Shuman & Clark, F. C. Hutchens and R. Bryant Foerster for Respondent.

SCHOTTKY, J.—Respondent corporation commenced an action against appellant to recover damages for alleged breach of contract. It alleged in substance that the parties entered into a written agreement whereby defendant agreed to deliver to plaintiff, between May 15, 1950, and June 1, 1950, at defendant's ranches, 800 head of cattle at 20 cents per pound, payment to be made by $100 at the time of the making of the agreement, $9,900 on the 10th day of January, 1950, and any balance as the cattle were loaded; that plaintiff performed all of the conditions precedent and was ready, able and willing to receive and to pay for the cattle, but that defendant failed and refused to deliver 800 head of cattle, but instead has delivered only 726 head, and that as a result of this breach plaintiff has been damaged $7,999.40, and also $269 in addition, which amount was overpaid said defendant on the purchase price through advances. A facsimile of the contract was appended to the complaint as an exhibit and is as follows: [See opposite.]

Defendant and appellant filed an answer and cross-complaint in which he admitted the signing of the contract; admitted that he delivered only 726 head of cattle; denied that he refused to deliver 800 head or that plaintiff had been damaged by his failure to deliver any cattle. In his cross-complaint defendant and appellant prayed that the court reform the contract in accordance with the actual intention of the parties, and that the court determine and decree that the defendant has fully performed said contract, as reformed. He alleged

that by mutual mistake the parties set the number of cattle to be sold at 800, both believing defendant had this number, when in fact the lot consisted of approximately 750 head; that in truth, at the time of the making of the contract there were only 748 head, and between the time of the making of the contract and the time of the roundup 10 head were lost and 8 head died; that when the steers were finally rounded up only 726 head were found; that it was never the intention of the plaintiff to buy, nor of the defendant to sell any definite

or specific number of steers, rather plaintiff intended to buy and defendant intended to sell all the steers of a certain breeding and brand then owned by defendant, and ranging in the state of Nevada; and that according to the true intentions of the parties the defendant has fully performed in accordance with the terms of the contract.

Following a trial before the court without a jury, the court found in favor of plaintiff on its complaint and against the defendant on his affirmative defense and cross-complaint for reformation, and found specifically "that the common intention, understanding and agreement of both plaintiff and defendant was correctly, accurately, truly and fully reduced to writing and was correctly, accurately, truly and fully incorporated in said agreement in writing."

In accordance with said findings judgment was entered in favor of plaintiff in the sum of $3,876.50, and this appeal is from said judgment.

Before discussing the contentions made by appellant we shall summarize briefly the testimony given at the trial, all of which came from two witnesses, Romie Rolleri and appellant.

Rolleri, a cattle buyer and agent for respondent, met appellant in Winnemucca, Nevada, in the afternoon of August 8, 1949, and during the afternoon and evening Rolleri had a conversation with appellant in which appellant offered to sell his steers to respondent for May delivery at 20 cents per pound, and after some discussion Rolleri agreed to buy them for that price. They wrote "the deal" on a napkin that night, and the contract as hereinbefore set forth was made and signed the next morning. The contract was written on a printed form. The printed words "No. of Head Purchased More or Less" were crossed out and the figure "800" was inserted in the space below those words. The words "No. to Be Picked from More or Less" were also crossed out, and no figures were placed in the space below those words. Under the word "Stock" appears the abbreviation "St." Rolleri testified that the word "St." was an abbreviation for steers. During the preliminary negotiations Rolleri asked appellant how many steers he had to sell and appellant said "I have got 800 steers to sell." According to Rolleri it was understood from the beginning of the discussions that appellant had 800 steers to sell and that the sale was of 800 steers. Appellant himself testified that he told Rolleri that he had about 800 steers, and that they talked about 800 steers and

that he glanced at the written contract and saw the price and the steers but paid no particular attention to the figure 800. On the morning of August 9, 1949, when the contract was signed appellant told Rolleri that he had 800 steers to sell and stated, according to Rolleri, "I will fill in with my heavy yearlings if I don't have the big steers, I will fill in with the heavy yearlings."

Appellant delivered only 726 steers to respondent, the deliveries being made between May 25, 1950, and June 1, 1950. After appellant had delivered 726 steers to plaintiff, Rolleri testified that he told appellant he was 74 steers short and that the company wanted the steers, and that appellant said, "I have not got them." Appellant testified that in October, 1949, after the making of the contract and after he had determined the number of steers he had, he told Rolleri he would be short of 800 head. He also testified that in August, 1950, he told Mr. Moffat, the respondent, the same thing and that Mr. Moffat said, "Forget about the cattle, just tear the ticket up."

At the time the contract was made appellant told Rolleri that some of the cattle were in Nevada and some were on two different ranches in California. The steers in Nevada were on the so-called Bill Wright ranch. Appellant claimed that he had 735 steers in Nevada which were yearlings and "twos" on August 9, 1949, and that he had about 125 yearling steers in Nevada on that date and 9 or 10 yearling steers, together with 5 or 6 older steers, in California at that time. Defendant stated that he also had 400 to 500 stock cattle in California on August 9, 1949, and that he had about 250 calves in California on that date. He also testified that he had about 125 yearling steers on June 1, 1950, which had been weaned the previous fall, and that these yearling steers were about 18 months old in June, 1950, and weighed about 650 to 700 pounds at that time. None of these yearling steers were shipped to respondent. Rolleri testified that a steer calf that was 8 to 10 months old in October, 1949, would be a steer in May and June in 1950; that a steer is a yearling until it is a year and a half old and then it is a short two; that it is a steer calf until it turns one year of age, and then it becomes a yearling steer. Rolleri further testified that he saw some steers on appellant's ranch in California after the last delivery to respondent, but appellant testified that these steers were purchased in Wyoming after the contract with respondent was made.

Rolleri testified that he had been engaged in the business of buying cattle for about 30 years; that he devoted his entire time to buying and selling cattle. He testified further that he bought about 15,000 head of cattle during the year 1950 and that the market or current price for steers in late May and early June of 1950 was 27½ cents for steers of an age, weight and quality similar to the steers that were purchased from appellant for respondent, and that the average weight of the steers sold by appellant at the time of delivery was 1,080 pounds.

Additional testimony will be referred to in the course of this opinion.

Appellant contends that the findings of the court are not supported by the evidence, and in arguing for a reversal of the judgment relies on the following points:

1. That under the terms of the contract, the title to said steers passed to the buyer on August 9, 1949.

2. That the buyer having prepared the contract, any ambiguity or uncertainty therein must be resolved against him.

3. That the buyer intended to buy and the seller intended to sell *the steers* then (*on August 9, 1949*) owned by seller ("on hand") and bearing a specifically designated brand and that the seller could not go on the open market and make up any shortage.

4. That there was a mutual mistake as to the number of said steers, if the figure 800 is to be considered as referring to the number of head and that said contract should have been reformed.

5. That appellant has fully performed said contract by delivering all the steers of the kind described by him and *"on hand"* on August 9, 1949, except those that were lost or died and that further or more complete performance of the contract by him was and is impossible.

6. That the plaintiff proved no damage.

Appellant devotes a considerable portion of his briefs to the contentions (1) that the title to the steers passed to respondent on August 9, 1949, and that the respondent must bear the loss of the 10 head of steers that appellant testified died or were lost in Nevada and the 8 head on his other ranches, and (2) that because of the death or loss of said steers further or more complete performance of the contract was impossible. Respondent in reply contends that these points were not presented to the trial court and that therefore they cannot be raised upon appeal.

A careful reading of the entire record makes it clear that appellant did not rely on these contentions in the trial court and that he did not urge them at any stage of the proceedings in the trial court. Indeed, when the case was called for trial, appellant's counsel sought permission to amend his answer so as to specifically deny that respondent had been damaged, and when this was opposed by respondent's counsel, appellant's counsel stated that it was through an inadvertence that the amount of damages was not denied, and added: "The basic question is whether or not there was a breach of the contract, and if a breach of contract, of course, as I say, it is obvious that the plaintiffs would be entitled to some damages, but the question is how much, and we don't want to concede that the amount claimed is the correct amount. All we want to do, of course, is put in issue the amount of damages." The court granted appellant permission to so amend his answer, and the amended answer and cross-complaint was filed after the trial. At no time in the trial court did appellant assert that the title to the steers passed at the time the contract was signed. In fact, appellant's counsel made a motion for a nonsuit on the ground that no damage had been proved, and stated: "The general rule, is of course, that where there is a contract to deliver and delivery is not made, that the party is required to go out on the open market and meet his requirements, and that if the other party is liable at all, he is liable for the difference," indicating clearly that he regarded the contract as a contract to deliver.

The record shows that the case was submitted to the trial court upon briefs and it is clear from the able memorandum opinion of the trial court (which discusses the evidence and issues in considerable detail), that no such issues as passage of title to the steers at the time the contract was signed, and impossibility of performance, were presented to the trial court.

In *MacKenzie* v. *Angle*, 82 Cal.App.2d 254 [186 P.2d 30], this court said at page 263, "A rule, early established and long adhered to in the courts of this state, is that questions not raised in a lower court will not be considered on appeal. [Citing cases.]" As stated in 3 California Jurisprudence 2d, Appeal and Error, section 140: "The rule is founded upon considerations of practical necessity in the orderly administration of the law and of fairness to the court and the opposite party, and upon the principles underlying the doctrines of waiver and estoppel."

■ And as this court said in *Munfrey* v. *Cleary*, 75 Cal. App.2d 779, at page 785 [171 P.2d 750]: "Also as a general rule where a case has been tried upon one theory that theory must be adhered to on appeal, and a party who has tried his case wholly or in part on a certain theory, which theory was acted upon by the trial court, cannot, on appeal, change his position and adopt a different theory, since to do so would be unfair to the trial court and to opposing counsel. [Citing cases.]"

. ■ In view of the foregoing authorities we are of the opinion that respondent is correct in his contention that the issue of the passage of title at the time the contract was signed and the issue of impossibility of performance were not presented to the trial court, and that they cannot be raised upon appeal. It would, therefore, serve no useful purpose to prolong this opinion by discussing these contentions and would .. but serve to encourage presenting in the appellate court issues which were not presented to the trial court. We will state, however, that we have considered the said contentions and believe that upon the record here they are without substantial merit.

After the filing of the briefs in the instant appeal respondent made a motion to augment the record on appeal by having appellant's brief in the trial court made a part of the record on appeal to show what issues were raised in the trial court. Respondent contended that this trial brief would show that appellant did not raise in the trial court either of the points just discussed. Appellant opposed this motion but did not concede that said points were not raised. From what we have hereinbefore set forth we are satisfied that the record shows that these issues were not urged in the trial court and that it is unnecessary to augment the record.

The principal contention of appellant at the trial and upon this appeal is: "That there was a mutual mistake as to the number of said steers—if the figure 800 is to be considered as referring to the number of head and that said contract should have been reformed."

We believe that the following quotation from the memorandum opinion of the learned trial judge is fully supported by the record and the authorities:

. "The Court is of the opinion that the defendant is not entitled to a reformation of the contract. The evidence does not establish that, by a mutual mistake of the parties, the written contract failed to embody any terms orally agreed

upon prior to its execution. The testimony is that on August 8, 1949, defendant told Mr. Rolleri that he had 800 steers, and the contract provided for the sale of 800 steers. ■ In order to justify the revision or reformation of a written contract, it must be shown that, through a mutual mistake of the parties or a mistake made by one party and known or suspected by the other party, the written agreement fails to express the terms of an oral agreement previously made by the parties. The rules governing reformation of written contracts are set forth by the Supreme Court of California in the case of *Bailard* v. *Marden* (1951), 36 Cal.2d 703, at 708-709 [227 P.2d 10], in the following terms:

" 'Section 3399 of the Civil Code provides that when, because of fraud or mistake, ". . . a written contract does not truly express [the intention of the parties, it may be revised . . . so as to express] that intention. . . ." [5] The purpose of reformation is to effectuate the common intention of both parties which was incorrectly reduced to writing. [6] To obtain the benefit of this statute, it is necessary that the parties shall have had a complete mutual understanding of all the essential terms of their bargain; if no agreement was reached, there would be no standard to which the writing could be reformed.

" 'Otherwise stated, " (I)nasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, a definite intention or agreement on which the minds of the parties had met must have pre-existed the instrument in question." (Citations.) Our statute adopts the principle of law in terms of a single intention which is entertained by both of the parties. ■ "Courts of equity have no power to make new contracts for the parties, . . . (N)or can they reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding." (22 Cal.Jur. § 2, p. 710.) If this were not the rule, the purpose of reformation would be thwarted.'

■ "The evidence herein does not establish that the parties ever orally agreed, or intended to enter into a contract, to buy and sell anything other than 800 head of steers. It is not shown that it was the common intention of both parties to buy and sell only as many steers as defendant may have owned, or that they ever agreed to buy and sell 726 steers instead of 800 head. There is no proof that the common intention of the parties was incorrectly reduced to writing. On the con-

trary, the evidence shows that the oral understanding was the same as the written agreement. The words 'more or less' above the figure '800' were stricken from the written agreement and there is no testimony that this was done by mistake or inadvertence or that the common intention of the parties was to buy and sell 800 cattle, 'more or less.' There is no evidence that defendant and Mr. Rolleri agreed to limit the steers to any specific lot or herd, but, on the contrary, it seems to have been contemplated from the beginning that the steers would come from three different ranches of the defendant.

"Under the circumstances, the Court believes that any revision or reformation of the written agreement would be the creation of a new contract—one never agreed to by the plaintiff—and that, therefore, the relief sought by defendant should be denied."

We agree with this analysis and are convinced that the findings of the trial court that "it is true that the common intention, understanding and agreement of both plaintiff and defendant was correctly, accurately, truly and fully reduced to writing and was correctly, accurately, truly and fully incorporated in said agreement in writing," and that "it is true that the figure '800' as inserted in said agreement was not inserted in said agreement as a result of any mistake of plaintiff and defendant or of plaintiff or defendant," are supported by substantial evidence.

The following language from *Bisno* v. *Herzberg*, 75 Cal.App.2d 235, 237 [170 P.2d 973], is applicable:

"But the rule with reference to the reformation of a written contract is that the evidence must be clear and convincing to the trial court, and on appeal its decision upon a conflict of evidence is conclusive. (*Sullivan* v. *Moorhead*, 99 Cal. 157, 161 [33 P. 796].) When a judgment is attacked as being unsupported the power of the appellate court begins and ends with its determination as to whether there is substantial evidence which will support the judgment of the trial court. [Citing numerous cases.]"

Appellant's final contention is that the respondent proved no damage. The trial court found that, by reason of appellant's failure to deliver 74 head af cattle, respondent was damaged in the sum of $3,607.50 and that respondent was also entitled to recover the sum of $269 overpaid to appellant for cattle delivered, making a total judgment of $3,876.50.

Appellant states: "There is no proof whatever to support this finding. The evidence shows that the average weight of

steers delivered by appellant was 1080 pounds per head. The testimony as to market price was limited and directed entirely to good to choice steers weighing around 1000 to 1100 pounds. There is no testimony whatever as to the market value of yearlings weighing 650 pounds." Appellant apparently bases his contention on the fact that in computing the damages the trial judge did so on the basis of heavy yearling steers weighing 650 pounds, and not the average weight of the 726 steers actually delivered, which was 1,080 pounds.

■ However, in view of the fact that the court determined upon sufficient evidence that appellant breached the contract by his failure to deliver 74 head of steers, the court could have awarded damages in a much larger amount. If the damages were computed on the average weight of the steers actually delivered they would show a total sum of $5,794.20. (74 x 1080 x 27¼¢ minus 74 x 1080 x 20¢.) Adding to this the admittedly owed sum of $269, we get the sum total of $6,063.20. The damages actually awarded in this case were $3,876.50. The basis of appellant's complaint is that "heavy yearlings" weren't included with the term "steers" ("St.") as used by the contract. However, the trial court found to the contrary upon conflicting evidence, and we must accept this finding.

It is interesting to note from the clerk's transcript that the court filed its memorandum opinion on December 7, 1951, in which it ordered judgment for respondent in the sum of $6,063.20, and that on January 7, 1952, the court filed an order modifying its former opinion by ordering judgment for $3,876.50. It is also interesting to note that in respondent's brief is set out a letter from appellant's counsel to the trial court, written after the memorandum opinion was filed, in which appellant's counsel stated:

"Instead of using the average weight of the steers delivered, it seems to us that you should have used the average weight of the long yearlings amounting to 650 pounds per head. If my figures are correct, this would amount to $48.75 per head or an aggregate sum of $3,607.50.

"If you agree with the writer, you will no doubt wish to modify or amend your Opinion before findings have been prepared and judgment submitted."

While this letter is not a part of the record, appellant in his closing brief does not deny sending it to the trial court.

■ And as stated in 4 California Jurisprudence 2d, Appeal and Error, section 485, "the failure of a party to deny a state-

ment of fact in his adversary's brief may result in the acceptance of its truth by the court where the record does not show the contrary. [Citing cases.]'' ▮▮ It is apparent that the court followed appellant's suggestion and request and modified its opinion by reducing the amount of damage accordingly. Under such circumstances appellant is hardly in a position to complain that there was no evidence as to the market value of long yearlings when he himself fixed their market value at 27½ cents per pound in his said letter to the court.

▮▮ Furthermore, it is clear from the record that the evidence would sustain a judgment against appellant far in excess of the amount awarded by the court. As stated in *Orfanos* v. *California Insurance Co.*, 29 Cal.App.2d 75, at page 82 [84 P.2d 233], appellant ''cannot complain of a judgment against it for an amount less than that which the evidence would have supported.''

We conclude, therefore, that appellant's contention that the evidence does not support the amount of damages awarded cannot be sustained.

No other points raised require discussion.

The motion to augment the record is denied. The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied August 24, 1953, and appellant's petition for a hearing by the Supreme Court was denied September 24, 1953.