[L. A. No. 21120. In Bank. Feb. 9, 1951.]

WILLIS R. BAILARD et al., Respondents, v. MURIEL MARDEN et al., Appellants.

Hiram T. Kellogg for Appellants.

McGinley & Hanson and Howard D. Hanson for Respondents.

EDMONDS, J.—Willis R. Bailard and his wife conveyed real property to Muriel Marden. The deed declared that the grant was made subject to all conditions and restrictions of record. By the mistake or inadvertence of the Bailards and their agents, the restrictions of record did not limit the use of the lot to residential purposes. When this situation became known to the Bailards, they sued for reformation of their deed and other relief. The appeal is from the judgment in favor of the Bailards.

In their third amended complaint a mutual mistake by the contracting parties was pleaded for a first cause of action. More particularly, it was alleged that, at the time of execution of the agreement of sale and the deed, the Bailards did not know Lot 21 was within the "business area," nor did they know or intend to permit its use for other than residential purposes. The same mistaken belief was held by the Mardens at the time they signed the agreement of sale and received the deed. Had the Bailards known the true facts, they would not have sold the lot.

For a second cause of action, the allegations concerning the Bailards' mistake were again stated. It was also charged that the Mardens, at the time of the execution of the agreement of sale and deed, knew of the mistake made by the Bailards or suspected that it existed.

The complaint prayed for reformation of the agreement of sale and the deed to restrict the property to use for a private single-family residence. In the event reformation is not decreed, the Bailards ask for rescission of the conveyance upon restoration of the purchase price and all moneys expended in improving the property, with interest.

The answer denied that any mistake was made by the Bailards. The Mardens pleaded that they purchased the lot for income purposes and, at the time of purchase, formulated the plan of constructing a motel and incidental business buildings. They selected the property because of the opportunity it would afford the family for income and employment, and, prior to the purchase, made an independent investigation of the official records and ascertained the applicable restrictions. In answer to the second cause of action, they denied that they knew or suspected a mistake had been made by the Bailards, or that the property would not have been conveyed to them in the absence of such mistake.

The evidence offered upon these issues shows that Bailard purchased several hundred acres of land from Marblehead Land Company. Prior to the conveyance, the entire tract was restricted for use as private single-family residences. Bailard agreed to purchase the property upon condition that the restriction be changed to give him the right to construct, upon the land adjoining the highway, one motel and buildings for incidental businesses. The restrictions were accordingly amended to provide for a "business area." Surveyors employed by Bailard to prepare a subdivision map of the tract were instructed to subdivide only the residence area. By mistake upon the part of the surveyors, a portion of the "business area" was shown on the map as Lots 14 to 25. This subdivided part of the "business area" is located upon a high bluff as contrasted with the remainder of the area which is relatively flat. The map was signed by Bailard and recorded.

Bailard testified that he purchased the tract for the purpose of subdividing and selling the residential area. His plan was to retain the "business area" upon which to construct an elaborate motel and incidental business buildings. His selling agent knew of the restrictions upon the property, and instructed the salesmen to inform prospective buyers that the lots were being sold for residential purposes only. All advertisements in connection with the tract, Bailard stated, offered the lots for sale as "home sites," and he first learned

of the mistake when construction of a motel was commenced by the Mardens.

The map and advertisements show Lot 21 to be the smallest and lowest priced one in the tract. It is situated upon the edge of a bluff and there is evidence that, although ideal for residential purposes, it is unsuited for business uses. This testimony was offered in corroboration of Bailard's declarations concerning his intentions regarding the property, and his statement that Lot 21 would not have been sold in the absence of the mistake made on the map.

As Mrs. Marden related the details of the purchase of the land, while looking for the business property which would give income and employment to the members of her family, she saw signs along the Pacific Coast highway advertising business lots. There were no such signs on Bailard's tract. She was shown Lot 21 by one of Bailard's salesmen. She did not inquire of him, or of anyone connected with the seller, about restrictions on Lot 21 or other lots in the tract, or whether it could be used for business purposes. However, her son asked the salesman for the name of the owner of the property so he could check the recorded deed with reference to restrictions. When Mrs. Marden was asked on cross-examination for what kind of business she intended to use Lot 21, she said no definite plans had been made at the time of purchase; they were to be developed in the future. According to her testimony, she "just walked on the property and saw where it was sitting, nice and high; it was on a corner, and that it might be possible to put business on the property."

Mrs. Marden also stated that she and her son examined the recorded restrictions. Thereafter, they went to the property and determined, by use of their automobile speedometer, that Lot 21 was within the "business area." The son reached the same conclusion by examining a map of the county engineer. They knew from the recorded deed that only one motel was permitted. However, they did not, before their purchase, inquire as to whether any plans for such a building had been approved.

Shortly afterward, Mrs. Marden, her son, and two daughters purchased Lot 21, as a family enterprise "for a home and income." The consideration was $850. Bailard had no direct dealings with the purchasers; all of the negotiations were carried on through his agents who had been instructed to sell residential lots only. The lot was purchased under a contract

of sale. In this contract and the deed executed two years later, the lot was described by reference to the subdivision map. However, the agreement of sale was made subject to "All of the conditions, restrictions, reservations, easements and exceptions set forth in that certain [recorded] grant deed" made by the land company to Bailard. The deed of Bailard and his wife to Mrs. Marden included a similar provision.

The Mardens constructed no improvements upon their lot until nearly four years after purchasing it. They then built what they referred to as a "tool shed." The family lived in this building. The Mardens' explanation as to the reason why plans for this building were not submitted to the land company for approval was that they did not know such action was required by their deed. They planted about 100 trees upon the lot and built a wire fence around it. Building materials were purchased from time to time without any definite purpose as to their use. All of the materials purchased were adaptable for the construction of a single-family residence. They were unable to estimate the time or money expended upon the improvements and no books or records were kept.

According to Mrs. Marden's testimony, about one year after the "tool shed" was built, she called at the office of the land company and requested a clarification of the meaning of the restrictions contained in her deed. She was advised that Lot 21 was situated in the "business area." She then inquired about the procedure for submitting plans for a motel. About two weeks later plans were submitted and rejected. A second set of plans was approved. When she submitted the plans, Mrs. Marden testified, Fred W. Marlow, an officer of the land company, stated, in substance, "there had been a big boner pulled" by someone which permitted construction of a motel upon their lot; Bailard had been in the office and was "burned up" about the situation. Marlow denied having made such a statement and declared that he did not remember seeing the Mardens until he appeared as a witness.

The trial court found that at the times of the execution of the sales agreement and of the deed, both Bailard and the Mardens believed that Lot 21 was restricted for use as a private single-family residence and intended that it be so restricted. Neither of them believed or intended that the exceptions in the deed from the land company, the sales agreement, or the deed to the Mardens, would permit the construction of a motel upon the property. Also, the findings recite, the

Mardens knew that this belief and understanding of the restrictions were entertained by the Bailards. As conclusions of law upon these findings, the court declared that the Bailards are entitled to a modification of the agreement of sale and of the deed to conform to their belief and intention, and it enjoined the Mardens from using the property for other than residential purposes.

As ground for reversal of the judgment which follows the court's conclusions, the Mardens contend that the evidence does not support the conclusion that the transaction was based upon a mutual mistake. Neither is there any evidence, they say, of any knowledge or suspicion by them that the Bailards sold the lot under any mistaken belief as to the restrictions. For these reasons, it is argued, all that is shown by the evidence is a unilateral mistake which cannot be corrected by reformation. The Mardens further contend that the Bailards were negligent and guilty of laches. They also insist that the alleged mistake complained of was not material to the contract.

Section 3399 of the Civil Code provides that when, because of fraud or mistake, ". . . a written contract does not truly express the intention of the parties, it may be revised . . . so as to express that intention. . . ." ▮ The purpose of reformation is to effectuate the common intention of both parties which was incorrectly reduced to writing. ▮ To obtain the benefit of this statute, it is necessary that the parties shall have had a complete mutual understanding of all the essential terms of their bargain; if no agreement was reached, there would be no standard to which the writing could be reformed.

Otherwise stated, "[I]nasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, a definite intention or agreement on which the minds of the parties had met must have pre-existed the instrument in question." (45 Am. Jur. § 7, p. 586; *Holmes* v. *Anderson*, 90 Cal.App. 276 [265 P. 1010]; 5 Williston, Contracts [rev. ed.], § 1548, p. 4339; Rest., Contracts, § 504, comment b.) Our statute adopts the principle of law in terms of a single intention which is entertained by both of the parties. "Courts of equity have no power to make new contracts for the parties, . . . [N]or can they reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding." (22 Cal.

Jur. § 2, p. 710.) If this were not the rule, the purpose of reformation would be thwarted.

█ In the present case, insofar as the right to reformation is concerned, the basic question is whether the Mardens intended the agreement of sale and the deed to prohibit the use of Lot 21 for income purposes. The trial court found that they did so intend and reformed the instruments to include such restrictions.

This finding, the Bailards insist, is supported by evidence which affirmatively shows that the Mardens purchased Lot 21 for use as a private residence and with no intention of constructing a motel upon it. The same evidence, it is said, refuted the testimony of the Mardens concerning their alleged inspection of the recorded map and deed, and shows that their entire defense was a recently contrived attempt to take advantage of the Bailards' honest mistake. In particular, the Bailards point to the physical characteristics of the property which make it highly suitable for a residence but less adaptable to business uses. Much is made of the Mardens' admitted failure to ask the selling agents whether the property could be used for income purposes and testimony that, when inspecting the lot, they ". . . were just talking about the beauties of the land."

The subject of restrictions upon use was not mentioned by the Mardens when the lot was purchased. The evidence also shows that, for approximately five years after acquiring the property, they used it only for residential purposes. In connection with that use, they lived upon the land, fenced it, and planted trees. From the evidence concerning their dealings with the land company, an inference might be drawn of lack of knowledge, at the time of purchase, that a motel could be constructed upon the site.

This evidence, as the Bailards argue, tends to prove that the Mardens did not purchase Lot 21 for income purposes or in reliance upon the restrictions of record. More specifically, it would support a finding that they then intended to use the property for residential purposes in accordance with a deed allowing them to do so. But it does not establish that they ever intended to buy the property under a contract prohibiting any other use or to accept a deed including such a restriction. Under these circumstances, reformation of the contract and the deed to prohibit the erection of any building other than a single-family residence does not express "the

intention of the parties." Rather, it is the creation of a contract which the evidence does not show was ever agreed to by the Mardens.

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.