[Civ. No. 14609. First Dist., Div. One. Apr. 27, 1951.]

JENNIE S. MARTINELLI, Individually and as Executrix, Respondents, v. J. P. GABRIEL et al., Appellants.

Joseph A. Brown for Appellants.

Gardiner & Riede for Respondents.

PETERS, P. J.—This is an action to reform a deed, on the ground of mutual mistake, to make it provide that the northwesterly boundary of a piece of property purchased by defendants from the plaintiffs should be 63 feet in length instead of 65 as set forth in the deed, and that the southeasterly boundary should be 92 feet instead of 94. The trial court reformed the deed as requested and defendants appeal.

Prior to 1945 plaintiffs owned a large rectangular piece of property consisting of four lots fronting on Main Street, in Inverness, Marin County. The lots were contiguous and were designated as Lots 3, 4, 5 and 6. Near the front of Lots 5 and 6 was constructed a lodge known as "Hunter's Lodge." Near the rear of these two lots was a residence which for some years had been leased to and occupied by defendants. The rear entrances of these two buildings were back to back, and quite close together. Separating the rear of the house and the rear of the lodge was an old fence running parallel to Main Street and crossing Lots 6, 5 and part of Lot 4. Admittedly, this fence had been on the property for many years, and admittedly it was located 63 feet from the property line of Main Street. Toward the rear of Lot 3 was a large oak tree, and a few feet in front of this tree was the rear wall of a cabin.

In October of 1945 defendants purchased from plaintiffs the front portions of these four lots, including the portions on which the lodge and cabin were located. The rear boundary of the area purchased is irregular. The description contained in the deed was based on a survey made and description furnished by one McDaniel, a civil engineer, employed by plaintiffs. This deed described the rear boundary of Lots

6, 5 and part of 4 as running parallel to Main Street and 65 feet therefrom, and the rear boundary of Lot 3 and the balance of 4 as running parallel to Main Street and 94 feet therefrom. Neither party then knew that the surveyor had made a 2-foot error, and that these distances should have been 63 and 92 feet respectively. Defendants went into possession of the property and, thereafter, paid taxes on the lots as described in the deed. Plaintiffs retained the rear portions of the four lots.

In January of 1948 "Hunter's Lodge" burned down, and defendants wanted to rebuild. They were informed by the planning commission that the new building would have to be set back a minimum of 20 feet from Main Street.· With the building that defendants wanted to construct this would leave very little distance from the rear of the new building to the rear of the old residence located on the property retained by plaintiffs. Under these circumstances the parties, in February, 1948, first discovered that the fence dividing Lots 6, 5 and part of 4 was 63 feet from Main Street, and that, if the fence was the proper boundary, those lots were only 63 feet in length instead of 65. If the true boundary was as described in the deed it would adversely affect the usability of the portions of the lots retained by plaintiffs. While this dispute remained unsettled, in March of 1950, a second dispute arose over the rear boundary of Lot 3 and the balance of Lot 4. The deed described this portion of the area as extending 94 feet from the property line of Main Street. If this was the proper distance it would include a portion of the oak tree heretofore mentioned. In 1949 the plaintiffs had constructed a fence along what they considered to be the back boundary of this area. This fence was constructed between the oak tree and the rear wall of the cabin heretofore mentioned, and resulted in the oak tree being on the property retained by plaintiffs. This fence was about 92 feet from the line of Main Street. Defendants, until this dispute arose, made no objection to the construction and location of this fence.

Plaintiffs offered evidence to the effect that before the purchase, and before the deed was executed, they and Mr. Gabriel went onto the property and mutually agreed that the old fence should constitute the rear boundary of the lots it crossed, and that the rear boundary for the balance of the area should run between the rear of the cabin and the oak tree on Lot 3. Defendants contradicted this evidence. The trial court found that prior to the execution of the deed the

parties orally agreed that the existing fence should constitute the rear boundary of the lots it crossed; that plaintiffs employed an engineer to make a survey and to prepare a proper description of the property for use in the deed; that when the deed, containing this description, was executed, both the buyers and sellers intended and believed that the description fixed the boundary along the existing fence line; that the descriptions of 65 and 94 feet are incorrect, and that the correct distances are 63 and 92 feet; that both parties intended to incorporate the correct distances in the deed, and believed that this had been done; that the deed fails to state the real agreement of the parties; that there was a mutual mistake of fact concerning the exact distances of the two lines in question; that the engineer discovered the cause and extent of his error in reference to the 65-63 foot line in February, 1948, and his 94-92 foot error in March of 1950, and informed the parties of these facts on those dates; that defendants have paid all the taxes on the property as described in the deed since October 8, 1945, but the defendants have never been in possession of the two-foot strip in dispute. Based on these findings the court, on the ground of mutual mistake, ordered the deed reformed to set forth the 63-foot and 92-foot boundaries.

The finding that there was a mutual mistake of fact is amply supported by substantial, clear and convincing evidence. Defendants had lived in the rear residence for several years prior to October 8, 1945, the date of their purchase, and so, of course, knew of the physical characteristics of the property, including the existence and location of the fence. Jennie Martinelli, one of the plaintiffs (her husband was ill and did not appear at the trial, and has since died), testified that prior to the purchase she went over the property with Mr. Gabriel, one of the defendants, and that he agreed upon the location of the dividing line; that in particular she told him, and he agreed, that the oak tree on the rear of Lot 3 should be on the property retained by plaintiffs, and that the boundary should go between the oak tree and the rear of the cabin located on that lot; that as to the rear boundary of Lots 6, 5 and part of 4 the boundary, she testified, and it was agreed, should be along the line of the existing fence; that it was never contemplated that the defendants should get any area beyond the fence.

The error that has caused this dispute was made by McDaniel, who was hired by the plaintiffs to make the survey.

It was he who gave the description of the two boundaries as being 65 feet and 94 feet, respectively, from Main Street. He prepared a plat plan containing these descriptions, and admittedly a copy of this plat plan was furnished to defendants, and admittedly the deed was prepared from the description there set forth.

McDaniel testified that he was hired by plaintiffs to survey the property in August or September of 1945; that he went upon the property and talked to plaintiffs, to Gabriel, and to Griese, a brother of Jennie Martinelli, about where the dividing line should be located; that the old wire fence was designated by all the parties, including Gabriel, as the rear boundary of Lots 6, 5 and part of Lot 4; that he ran his survey line along and from this fence in the presence of Gabriel and the other parties; that he started his survey from about where the fence ends in Lot 4, having been instructed by Gabriel and the others to start at that point; that he ran his line along the fence to the line of Inverness Way which was to constitute the northwesterly boundary of Lot 6; that he placed a marker at this point and then ran a line along Inverness Way to where it intersected Main Street, where he also placed a marker; that Gabriel was present and saw him place these markers. Along the property line of Main Street there was a hedge. This made it inconvenient for him to run his survey directly along this line, so he made an offset 2 feet out into the street and made his survey along this offset line 2 feet from and parallel to the true line. He intended, of course, to deduct this 2-foot offset in making his final calculations, but inadvertently failed to do so. Thus, the distance of 65 feet is the distance from the fence to this offset line, and this same error in calculation accounts for the 94-foot distance in the deed, which should be 92 feet.

The testimony of Jennie Martinelli and McDaniel was corroborated by the brother of Jennie, George Griese. He testified that before plaintiffs and defendants entered into their agreement he went on the property with Gabriel and laid out the boundaries with him. He was emphatic that he told Gabriel, and that Gabriel agreed, that the oak tree was to be on the property retained by plaintiffs, and that the old fence should be the other rear boundary.

McDaniel discovered his error in reference to the 63-65 foot boundary dispute in February, 1948, at which time he talked to the interested parties, took measurements from his markers still on the premises and discovered and reported his error.

Gabriel at this time told him that the old fence was intended to be the rear boundary in that area. At this time he was accompanied by an assistant who corroborated much of McDaniel's testimony as to what occurred on this date. In reference to the 94-92 foot dispute, McDaniel testified that he did not check this figure until March, 1950, when he discovered, in the presence of the counsel for defendants, that the same 2-foot error had crept into this computation.

Gabriel contradicted most of this evidence. He denied going upon the property and agreeing with Jennie Martinelli, Griese and McDaniel that the oak tree should remain on the property retained by plaintiffs, or that the old fence should constitute the boundary. In fact, he denied ever seeing or discussing boundaries with McDaniel before the deal was completed. He testified that he relied solely on the plat plan prepared by McDaniel which contained the erroneous descriptions. These conflicts were for the trial court.

Appellants' main argument seems to be that the mistake was a unilateral one. They urge that the surveyor was the employee of plaintiffs and that it was his error that caused the wrong descriptions to be inserted in the deed. ■ It is the law that, in the absence of fraud or knowledge on the part of the other party, there can be no relief in equity against a unilateral mistake. (*Miller* v. *Lantz*, 9 Cal.2d 544 [71 P.2d 585] ; *Baines* v. *Zuieback*, 84 Cal.App.2d 483 [191 P.2d 67].)
■ It is also true that the burden is on the person alleging mutual mistake to establish it by clear and convincing evidence. (*Taff* v. *Atlas Assur. Co.*, 58 Cal.App.2d 696 [137 P.2d 483].)
■ But it is equally clear that if the mistake is mutual the court has power to reform the contract to make it express the true intent of the parties. Section 3399 of the Civil Code provides: ''When, through fraud or a mutual mistake of the parties, . . . a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.''
■ The evidence supports the finding that there was here a mutual mistake within the meaning of that code section. The evidence believed by the trial court is to the effect that the contracting parties went over the property and determined where the boundaries were to be located without regard to distances. The trial court found, and the finding is amply supported, that both parties understood, intended and agreed

that the physical boundaries should control. The deed, based upon the survey, was not in accordance with the understanding of the parties. That this constitutes a mutual mistake entitling the parties to a reformation is too clear to require extended comment.

In *Home & Farm Co.* v. *Freitas*, 153 Cal. 680 [96 P. 308], the parties orally agreed upon the land to be sold, and the seller prepared a deed. The map used as the basis for the descriptions in the deed had a false line. The deed was therefore not in accordance with the understanding and intent of the parties. It was held that it should be reformed. In so holding, the court stated (p. 685) : "In emphasizing the fact that the defendant obtained more than the exact acreage which he had contracted to purchase, we are not unmindful of the principle that a description of land in a deed by metes and bounds conveys the legal title to all of the land embraced within such boundaries, regardless of the acreage which may be specified in the deed, but nevertheless it is true that such a description does not preclude a court of equity from reforming such a deed so as to express the true intent of the parties. [Citing authorities.] The court's finding of the mistake and of its mutuality is well supported and will not be disturbed. Where a defendant in such an action is seeking to hold more than he is justly entitled to, and where the very issue in the action is the mutuality of the mistake, the trial court is compelled to decide upon conflicting evidence, and if a mere denial of the defendant that he was mistaken is to suffice, it must result in every case that where such denial is made the plaintiff must fail of relief. Such, as has been above shown, however, is not the law." (See, also, *Breen* v. *Donnelly*, 74 Cal. 301 [15 P. 845].)

Appellants make substantially the same argument in another form. They point out that respondents knew of the distances set forth in the deed and plat, presented the plat and deed to appellants, and that they relied upon the descriptions there set forth. It is argued that this should constitute an estoppel. If the mere fact that a person seeking to reform a deed knew of the written description were to constitute a bar to reformation, there never could be a reformation where the mistake was contained in a written document, which the party seeking relief has read. That is not the law. The fact that the party seeking relief has read the instrument and knows its contents does not prevent a court from finding that it was executed under a mistake. (*Tomas*

v. *Vaughn,* 63 Cal.App.2d 188 [146 P.2d 499] ; *Tieso* v. *Tieso,* 67 Cal.App.2d 872 [155 P.2d 659] ; *Engebrecht* v. *Shelton,* 69 Cal.App.2d 151 [158 P.2d 570].)

Equally untenable is the contention of appellants that all prior negotiations of the parties became merged in the written instrument, and that parol evidence was not admissible to vary the terms of the written instrument. ■ Aside from the fact that no objection was made to the admissibility of this evidence so that the question of admissibility was, therefore, waived (*Palm* v. *Smither,* 52 Cal.App.2d 500 [126 P.2d 428]), it is well settled that ''In an action to reform a contract, parol evidence is admissible to show that the writing through mistake does not express the intention of the parties, and does not contain the real contract. And this is true notwithstanding the fact that the instrument evidences a contract, which, by the statute of frauds, is required to be in writing.'' (10 Cal.Jur. p. 936, § 202, where many cases are cited and relied upon ; see, particularly, *McNew* v. *Rench,* 79 Cal.App.2d 644 [180 P.2d 410] ; *Oatman* v. *Niemeyer,* 207 Cal. 424 [278 P. 1043] ; Code Civ. Proc., § 1856.)

■ The last contention of appellants is equally without merit. It is urged that respondents are asking in an equitable proceeding that the 2-foot strip be returned to them when they have not offered to reimburse the appellants *pro tanto* for the taxes paid by them on the 2-foot strip. The evidence as to the payment of taxes came into the case in support of appellants' then theory that they had title to the strip by adverse possession, a point now abandoned. The issue of repayment, *pro tanto,* of the taxes was not raised in appellants' answer or mentioned in the trial. It is a completely new theory first raised on appeal. No evidence at all as to how the taxes should be allocated was offered. Under such circumstances the point cannot now be raised.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied May 26, 1951, and appellants' petition for a hearing by the Supreme Court was denied June 25, 1951.