[No. S092697. Feb. 28, 2002.]

JOHN HESS, Plaintiff and Appellant, v.
FORD MOTOR COMPANY, Defendant and Appellant.

## COUNSEL

Law Offices of Michael J. Piuze, Michael J. Piuze and John Keiser for Plaintiff and Appellant.

Snell & Wilmer and Richard A. Derevan for Defendant and Appellant.

Hugh F. Young, Jr., and Harvey M. Grossman for The Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**BROWN, J.**—This case presents two unrelated issues. First, the plaintiff enters into a release agreement with one tortfeasor and his insurance company. The agreement, however, contains broad language ostensibly releasing all potential tortfeasors from liability. We now consider whether this language bars the plaintiff's claims against a tortfeasor who was not a party to the release. Based on the uncontroverted evidence at trial, we conclude it does not.

Second, the plaintiff obtains a judgment more favorable than his offer of compromise under Code of Civil Procedure section 998 (section 998 offer), and is entitled to interest on the judgment from the date of the offer to the date of satisfaction of judgment pursuant to Civil Code section 3291. We now consider whether the plaintiff is entitled to interest on the prejudgment portion of the interest accrued under Civil Code section 3291, i.e., compound interest or interest on interest. We conclude he is not.

### BACKGROUND

John Hess was a passenger in a Ford pickup truck on Christmas morning. At an intersection, a car driven by Charles Phillips struck the Ford truck, and

the truck rolled over at least one and a half times. Hess suffered severe injuries and is now a paraplegic.

Before filing a lawsuit, Hess made a claim against Phillips and his insurance company, Continental Insurance Company (Continental). Hess's attorney at the time negotiated with Brad Sommers, the claims adjuster for Continental, and settled Hess's claim against Phillips for $15,000, the policy limit. As part of the settlement, Hess signed a one-page boilerplate release form provided by Continental (Release).

The Release stated that Hess "release[s], acquit[s] and forever discharge[s] Charles Phillip[s], Continental Insurance and any and all agents and employees, UAC [the underwriters adjusting company] and any and [all] agents and employees and his, her, their, or its agents, servants, successors, heirs, executors, administrators and *all other persons, firms, corporations, associations or partnerships* of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever" that Hess had or might have due to the accident. (Italics added.) The Release further stated that Hess "declare(s) and represent(s) that . . . this Release contains the entire agreement between the parties hereto . . . ."

Several months after signing the Release, Hess hired a new attorney and filed suit against Ford Motor Company (Ford) and others, alleging negligence, strict liability and breach of warranty. Less than one year later, Hess served on Ford a section 998 offer in the amount of $2 million.

Over four years after Hess filed suit, Phillips, as cross-defendant, made a motion for determination of good faith settlement pursuant to Code of Civil Procedure section 877.6, which the trial court granted. Upon discovering the Release, Ford and the other defendants moved for summary judgment on the ground that the Release absolved *all* potential tortfeasors of liability. The court granted the motion, finding the language of the Release unambiguous.

Shortly before the summary judgment, Hess filed a separate lawsuit against Phillips and Continental for reformation of the Release pursuant to Civil Code section 3399. In the complaint, Hess asked the court to strike the language in the Release discharging "all other persons, firms, corporations, associations or partnerships" due to mutual mistake. Phillips and Continental admitted the mutual mistake in their answer, and a different judge reformed the Release by striking the above language less than 10 days after the summary judgment for Ford.

Based on this reformation of the Release, Hess moved for a new trial. The trial court denied the motion. On appeal, however, the Court of Appeal

reversed the summary judgment. Relying on the declarations of Hess's first attorney and Sommers, which stated that they had not intended to release Ford, the court concluded that "there was at least a triable issue of fact as to whether [a mutual mistake occurred and] the parties intended to release all other defendants." In reaching this conclusion, the court did not rely on the reformation judgment.

At trial, Ford was the only defendant left. In support of its position on the scope of the Release, Ford submitted the written agreement and presented no other evidence. In opposition, Hess introduced his own testimony and testimony from his former attorney and the claims adjuster who had negotiated the Release.

Hess testified that, before he signed the Release at his hospital bed, he asked his first attorney about the contractual language at issue, and his attorney told him the Release was a standard form document. Hess then testified that he had not intended to release Ford from liability.

Hess's first attorney testified that he recommended settling with Phillips for the policy limit of $15,000, because an asset search revealed that Phillips had no money. He further testified that he had not intended to release Ford, and that he told Hess the Release only covered Phillips, his insurance company, and the adjusting company. Finally, the attorney stated that he had bought the Ford pickup truck involved in the accident for use as evidence in litigation against Ford after agreeing to settle with Phillips but before Hess signed the Release.

Sommers, the former claims adjuster who had settled the case on behalf of Phillips and Continental, testified that he and Hess's attorney discussed Hess's intention to sue Ford and others and that Hess's attorney told him he was settling with Phillips and Continental in order to defray future litigation costs. Sommers then testified that Hess would not have settled and signed the Release if it had released Ford. Finally, Sommers testified that he (1) had not intended to release Ford; (2) had not prepared the Release or chosen the form used; and (3) had intended to protect Phillips and his insurance companies from "future exposure."

At the close of evidence, Ford moved for a nonsuit based on the Release. The trial court denied the motion. Later, the court granted Hess's request for judicial notice of the reformation judgment, and instructed the jury that "the Los Angeles Superior Court . . . ordered that the words 'and all other persons, firms, corporations, associations, or partnerships' be taken out of" the Release.

The jury returned a verdict for Hess and found Ford liable for 55 percent of Hess's injuries. The jury awarded Hess $2,701,813 in economic damages and $8,400,000 in noneconomic damages. After crediting Ford for Hess's settlements with other defendants, the trial court entered judgment against Ford in the amount of $6,644,155, plus interest from the date of the section 998 offer. In doing so, the court refused to include prejudgment interest accrued under Civil Code section 3291 in the judgment and to award interest on this prejudgment interest. The court also denied Ford's motions for judgment notwithstanding the verdict and for a new trial.

Ford appealed, contending, among other things, the trial court erred by instructing the jury that another court had reformed the Release and, in effect, directing a verdict for Hess on the issue of whether the Release covered Ford. Hess cross-appealed, seeking a recalculation of the judgment.

The Court of Appeal affirmed the verdict in an unpublished opinion, holding that any instructional error was harmless because Ford failed to establish that it was an intended beneficiary of the Release. The Court of Appeal also remanded for recalculation of the judgment, ordering that (1) "the judgment shall include" prejudgment interest accrued from the date of the offer of compromise to the date of the judgment pursuant to Civil Code section 3291; and (2) "the resulting judgment shall bear interest at the rate of 10% from" the date of the judgment until satisfied. At the date of the Court of Appeal opinion, accrued simple interest already exceeded $6.5 million.

We granted review to determine whether: (1) language in an agreement releasing "all other persons, firms, corporations, associations or partnerships" from liability encompasses a tortfeasor who was not a party to the settlement negotiations; and (2) a plaintiff may recover interest on interest accrued under Civil Code section 3291 from the date of the section 998 offer to the date of judgment because this prejudgment interest must be included in the judgment pursuant to rule 875 of the California Rules of Court.[1]

DISCUSSION

I

■ The Release discharges "all other persons, firms, corporations, associations or partnerships" from liability. Ford contends this language is unambiguous and releases it from liability notwithstanding the extrinsic evidence presented by Hess. In the alternative, Ford contends the jury—and not the trial court—should have determined whether the Release covered Ford because there was a triable issue of fact. We disagree.

---

[1]All further rule references are to the California Rules of Court.

 Under subdivision (a) of section 877 of the Code of Civil Procedure, a release given in good faith to a tortfeasor "shall not discharge any other such party from liability unless its terms so provide . . . ." In determining whether the "terms so provide" (*ibid.*), we apply the same rules that govern any other contract. (See Civ. Code, § 1635 ["All contracts . . . are to be interpreted by the same rules, except as otherwise provided by this Code"]; see also *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 [87 Cal.Rptr.2d 856] (*Neverkovec*); *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554 [32 Cal.Rptr.2d 676] (*Appleton*).)

 A third party beneficiary may enforce a contract made for its benefit. (Civ. Code, § 1559.) However, "[a] putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit" it. (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 436 [204 Cal.Rptr. 435, 682 P.2d 1100] (*Garcia*).) Ascertaining this intent is a question of ordinary contract interpretation. (*Ibid.*) Thus, "[t]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement." (*Neverkovec, supra,* 74 Cal.App.4th at p. 348.)

Under long-standing contract law, a "contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) Although "the intention of the parties is to be ascertained from the writing alone, if possible" (*id.,* § 1639), "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates" (*id.,* § 1647). "However broad may be the terms of a contract, it extends only to those things . . . which it appears that the parties intended to contract." (*Id.,* § 1648.)

"When, through . . . mistake . . . , a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." (Civ. Code, § 1640.) If there is "a mutual mistake of the parties," a written contract "may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (*Id.,* § 3399.) In reforming the written agreement, a court may "transpose[], reject[], or suppl[y]" words (*Heidlebaugh v. Miller* (1954) 126 Cal.App.2d 35, 38 [271 P.2d 557]), but has " 'no power to make new contracts for the parties' " (*Bailard v. Marden* (1951) 36 Cal.2d 703, 708 [227 P.2d 10], quoting 22 Cal.Jur. (1925) Reformation of Instruments, § 2, p. 710). Rather, the court may only reform the writing to conform with the mutual understanding of the parties at the time they entered into it, if such an understanding exists. (*Bailard,* at p. 708.)

■ To raise mutual mistake as a defense, the aggrieved party does not have to ask "for a reformation of the contract or" have "the same reformed." (*California Packing Corp. v. Larsen* (1921) 187 Cal. 610, 612 [203 P. 102].) The party need only allege and prove mutual mistake in order to avoid enforcement of the erroneous terms. (*Ibid.*; see also *Gillis v. Sun Ins. Office, Ltd.* (1965) 238 Cal.App.2d 408, 414-415 [47 Cal.Rptr. 868, 25 A.L.R.3d 564] [affirming reformation for mistake where appellant had sufficient notice of respondent's claim of mistake]; *Pasqualetti v. Galbraith* (1962) 200 Cal.App.2d 378, 381 [19 Cal.Rptr. 323] (*Pasqualetti*) [party who provides sufficient notice he is claiming mistake as a defense to a contract claim may introduce evidence as to that defense].)

In determining whether a mutual mistake has occurred, a court may consider parol evidence. (*Chastain v. Belmont* (1954) 43 Cal.2d 45, 51 [271 P.2d 498] (*Chastain*).) Such evidence is admissible to show mutual mistake even if the contracting parties intended the writing to be a complete statement of their agreement. (See Code Civ. Proc., § 1856, subd. (e).) "It is the rule that, where the writing itself, through mistake, does not express the intention of the parties who entered into it . . . and the writing does not therefore contain the real contract between the parties, the objection as to parol evidence is without merit." (*Pasqualetti, supra*, 200 Cal.App.2d at p. 381.) Extrinsic evidence is necessary because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions. (See *French v. Brinkman* (1963) 60 Cal.2d 547, 552-553 [35 Cal.Rptr. 289, 387 P.2d 1].)

■ In this case, Hess offered no reasonable alternative construction of the contractual language ostensibly releasing Ford and therefore failed to allege any ambiguity in this language. (See *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568] [contractual language is "ambiguous *only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms"].) Instead, Hess alleged mutual mistake as his only defense to Ford's claim of third party beneficiary status and merely argued that this language should have been omitted from the Release. Thus, Hess prevails *only if* he establishes that the inclusion of language ostensibly releasing Ford was a mistake. ■ Where, as here, the sole defense to a third party beneficiary claim is mutual mistake and the meaning of the relevant contractual language is not in dispute, the party alleging the mistake—and not the party claiming third party beneficiary status (see *Garcia, supra*, 36 Cal.3d at p. 436 [party claiming third party beneficiary status bears burden of proof where the "interpretation of the written contract" is at issue])—bears the burden of proving that a mistake occurred (see *Crail v. Blakely* (1973) 8 Cal.3d 744, 750, fn. 3 [106 Cal.Rptr. 187, 505 P.2d 1027] [party alleging mistake bears the burden of proof]).

▮ To determine whether Hess has proven that a mutual mistake occurred, we consider the extrinsic evidence of the contracting parties' intent introduced at trial.[2] (See *Chastain, supra,* 43 Cal.2d at p. 51.) This extrinsic evidence is uncontroverted and establishes, as a matter of law, that the inclusion of contractual language ostensibly releasing Ford from liability was a mutual mistake. Therefore, any instructional error on this issue was harmless.

As an initial matter, the uncontroverted testimony about the circumstances surrounding the formation of the Release demonstrates that the contracting parties did not intend to release Ford. Ford was not involved in the negotiations and did not sign the Release. Hess's attorney at the time and Sommers, the claims adjuster who negotiated the settlement on behalf of Phillips and Continental, openly discussed Hess's intention to sue Ford after the settlement and to use the settlement proceeds to fund future litigation against Ford. Sommers even acknowledged that Hess would not have settled or signed the Release if Phillips and Continental had wanted to discharge Ford from liability. The purchase of the Ford truck by Hess's attorney *after* agreeing to the settlement further confirms that Hess did not intend to release Ford.

The uncontroverted testimony also explains how the mistake occurred. Continental provided the Release and used a standard form with boilerplate language. Sommers, the claims adjuster who negotiated the terms of the settlement on behalf of Continental, did not choose or review the form before Continental mailed it. While the failure of both sides to catch the erroneous language under these circumstances may not be excusable, it is hardly uncommon. (See Annot., Release of One Joint Tortfeasor as Discharging Liability of Others Under Uniform Contribution Among Tortfeasors Act and Other Statutes Expressly Governing Effect of Release (1992) 6 A.L.R.5th 883.)

None of the testimony cited by Ford conflicts with the testimony cited above. Sommers's testimony that he intended to protect Phillips and Continental from "future exposure" does not contravene his unequivocal testimony that the Release was not intended to cover Ford. Indeed, Phillips's filing of a motion for determination of good faith settlement in response to cross-complaints asserted against him instead of relying on the language of the Release confirms that Phillips and Continental had no intention to release Ford. (*Neverkovec, supra,* 74 Cal.App.4th at pp. 352-353.)

Sommers's speculation that the phrase "all other persons, firms, corporations, associations or partnerships" covered Fidelity Casualty and Insurance

---

[2]Accordingly, we do not reach the issue of whether a stranger to the contract may invoke the parol evidence rule.

Company, a company owned by Continental, also does not conflict with his testimony that this phrase was not intended to cover Ford. Even if the parties arguably intended to include some version of this phrase in the Release, the uncontroverted evidence establishes that they did not intend to include language releasing Ford. Thus, the inclusion of the exact language at issue here was still a mutual mistake notwithstanding Sommers's speculation.

█ Where, as here, the extrinsic evidence is not in conflict, the determination of whether a mutual mistake occurred is a question of law. (See *Alderson v. Insurance Co. of North America* (1990) 223 Cal.App.3d 397, 412 [273 Cal.Rptr. 7] [affirming finding of mutual mistake on summary judgment where the extrinsic evidence was uncontroverted]; cf. *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710 [50 Cal.Rptr.2d 323] ["The trial court's resolution of an ambiguity [in the contract] is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict"].) "It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence." (*Garcia, supra*, 36 Cal.3d at p. 439.) █ Here, the extrinsic evidence is uncontroverted, and all of this evidence points to a mutual mistake and establishes that the parties to the Release did not intend to discharge Ford from liability. Hess was therefore entitled to a directed verdict on the Release issue despite the contractual language. (See *Campbell v. Republic Indemnity Co.* (1957) 149 Cal.App.2d 476, 480 [308 P.2d 425] [where "[t]here was no conflict in the evidence as to the material facts," reformation of the contract "could not reasonably have been refused"].)

In any event, the language of the Release is hardly conclusive because it arguably supports a finding that the contracting parties did not intend to release Ford from liability. For example, the small amount of the settlement—$15,000—despite the severity of Hess's injuries strongly suggests that the Release did not cover Ford. The failure of the Release to specifically name Ford even though the signatories to the Release had counsel and were aware of Hess's claims against Ford also suggests that the Release did not cover those claims. (See *Appleton, supra*, 27 Cal.App.4th at pp. 555-556 [failure of release to expressly mention defendant even though he was a key actor in the accident suggests that the parties did not intend to release him]; *Asare v. Hartford Fire Ins. Co.* (1991) 1 Cal.App.4th 856, 863 [2 Cal.Rptr.2d 452] [failure of release to refer expressly to discrimination claims indicates that the parties did not intend the release to cover such claims where parties had counsel and were aware of the claims].)

Ford's challenge to the admissibility and relevance of the contracting parties' testimony is unavailing. At oral argument, Ford contended that this

testimony did not support the judgment because it represented the contracting parties' subjective intent. Ford's contention, however, makes no sense. The goal of contract law is to ascertain the parties' actual intent at the time they made the contract. (Civ. Code, § 1636.) This intent is necessarily subjective. Moreover, the contracting parties did not simply offer subjective opinions about the scope of the Release but related objective facts surrounding their negotiations over the Release, including the contents of their discussions. To the extent Ford claims that this testimony only represents the undisclosed intentions of the contracting parties, Ford is wrong. The contracting parties openly discussed Hess's intention to sue Ford and to use the settlement proceeds to fund litigation against Ford during the settlement negotiations. In fact, the released party acknowledged that Hess would not have settled if the Release had absolved Ford of liability. Because the testimony of the contracting parties described their *disclosed* intentions, it was undoubtedly relevant. As such, we do not address the issue of whether undisclosed intentions are admissible "to assist the trier of fact in understanding the surrounding circumstances and negotiations . . . ." (*Neverkovec, supra*, 74 Cal.App.4th at p. 351, fn. 9.)

Likewise, Ford's claim that Sommers's testimony cannot support the judgment because he only testified as to his *personal* intentions is meritless. Ford does not dispute that Sommers negotiated the Release on behalf of Phillips and Continental and had the authority to settle the matter on their behalf. Because Sommers was the *only* agent of Phillips and Continental who negotiated the Release, his intentions necessarily represented the intentions of Phillips and Continental. (See *Garcia, supra*, 36 Cal.3d at p. 439, fn. 7 [testimony of agent who negotiated contract on behalf of contracting party is relevant for determining the intent of that party].)

■ Ford's invocation of third party beneficiary status does not compel a contrary conclusion. Determining whether Ford was a third party beneficiary of the Release is a question of ordinary contract interpretation. (See *Garcia, supra*, 36 Cal.3d at p. 436.) Because the rules of contract law establish that the parties to the Release did not intend to benefit Ford (see *ante*, at pp. 526-527), Ford is an "intermeddler" and cannot enforce the terms of the Release (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584]). In any event, Ford acquired no rights for value and could therefore suffer no prejudice from any reformation of the Release. (Civ. Code, § 3399 [court may reform an agreement for mutual mistake if the reformation does not prejudice "rights acquired by third persons . . . for value"].)

Ford's reliance on *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 [58 Cal.Rptr.2d 875, 926 P.2d 1061] is also misplaced. In

*Rosenthal*, the plaintiffs asked the court to find an arbitration agreement void for fraud in the execution. (*Id.* at p. 423.) We held that the plaintiffs' negligence in failing to review the agreement precluded the requested relief. (*Ibid.*) We, however, noted that a contracting party's negligence does not necessarily preclude equitable relief, such as reformation. (*Id.* at pp. 421-423.) ■ Indeed, we have long held that ordinary negligence will not bar a claim of mutual mistake because "[t]here is an element of carelessness in nearly every case of mistake . . . ." (*Van Meter v. Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 P.2d 644].) Only gross negligence or "preposterous or irrational" conduct will preclude a finding of mutual mistake. (*Id.* at p. 595.) Thus, "[t]he fact that the party seeking relief has read the instrument and knows its contents does not prevent a court from finding that it was executed under a mistake." (*Martinelli v. Gabriel* (1951) 103 Cal.App.2d 818, 824 [230 P.2d 444]; see also *Tomas v. Vaughn* (1944) 63 Cal.App.2d 188, 194 [146 P.2d 499] ["But the law seems well settled that where the evidence was sufficient to satisfy the court that the contract did not express the intention of the parties, and that plaintiff had been mistaken in supposing that it did, then the fact of his having read the instrument would not prevent the court from finding that it was executed under a mistake"].) Likewise, representation by counsel does not preclude a finding of mutual mistake. (See *Renshaw v. Happy Valley Water Co.* (1952) 114 Cal.App.2d 521, 523, 524-525 [250 P.2d 612] [affirming reformation for mutual mistake even though the aggrieved party's counsel made the mistake].) ■ Here, the contracting parties knew Hess intended to sue Ford after signing the Release, but mistakenly used a boilerplate form with overly broad language to memorialize their agreement. Under these facts, Hess is, at most, guilty of ordinary negligence and not the gross negligence necessary to preclude relief. (See *Van Meter*, at p. 595.)

Finally, we note that our conclusion is consistent with those Court of Appeal decisions broadly construing analogous language in a release as a bar to claims against all potential tortfeasors. In two of those cases, the party opposing enforcement of the release either presented no competent evidence that the contracting parties did not intend to release all potential tortfeasors (see *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 441 [15 Cal.Rptr.2d 622]), or evidence only of the undisclosed intentions of the contracting parties (see *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 560-561 [90 Cal.Rptr.2d 469]). In the other case, there was extrinsic evidence that the contracting parties intended to release all potential tortfeasors and no evidence that the contracting parties intended to exclude the defendant from the scope of the release. (See *Lama v. Comcast Cablevision* (1993) 14 Cal.App.4th 59, 63 [17 Cal.Rptr.2d 224].) Unlike those cases, Hess presented extrinsic evidence of the disclosed intentions of

the parties to the Release, and this uncontroverted evidence establishes that these parties did not intend to release Ford from liability. (See *ante*, at pp. 526-527.)

Indeed, our Courts of Appeal have consistently reversed summary judgment for defendants seeking to enforce a release where the extrinsic evidence suggests that the contracting parties did not intend to benefit the defendants. (See *Vahle v. Barwick* (2001) 93 Cal.App.4th 1323, 1329-1330 [113 Cal.Rptr.2d 793]; *Neverkovec, supra,* 74 Cal.App.4th at pp. 352-353; *Appleton, supra,* 27 Cal.App.4th at pp. 555-556.) Because the uncontroverted evidence establishes, as a matter of law, that the parties to the Release made a mutual mistake and did not intend to release Ford, the trial court properly removed the issue of the scope of the Release from the jury. Accordingly, the jury instruction judicially noticing the reformation judgment, even if erroneous, was harmless and does not warrant reversal.[3] (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203] ["instructional error requires reversal only ' "where it seems probable" that the error "prejudicially affected the verdict" ' "].)

As a final note, we echo the advice of the Court of Appeal in *Neverkovec* and urge counsel to be wary of "overly broad, loose terms in release agreements." (*Neverkovec, supra,* 74 Cal.App.4th at p. 354.) "The adage that an ounce of prevention is worth a pound of cure applies here—attorneys' energies are better spent making sure that release agreements accurately reflect their clients' intentions than in litigating what their clients really intended when they signed agreements . . . ." (*Id.* at p. 355, italics omitted.)

## II

Under Civil Code section 3291, a plaintiff who makes a section 998 offer and "obtains a more favorable judgment" receives 10 percent interest per annum on the judgment "from the date of the plaintiff's first offer . . . which is exceeded by the judgment . . . until the satisfaction of judgment." Both parties agree that Hess is entitled to interest pursuant to Civil Code section 3291. They, however, disagree over whether any of this interest should be included in the judgment. Hess contends that interest accrued from the date of his section 998 offer to the date of the judgment should be added to the judgment pursuant to rule 875—which states in relevant part that "[t]he clerk shall include in the judgment any interest awarded by the court . . . ." Thus, he argues, he is entitled to 10 percent interest on any such prejudgment interest accrued under Civil Code section

---

[3]Because we need not address the propriety of the reformation judgment or its impact on the resolution of this case, we decline to do so.

3291. Ford counters that section 3291 does not permit interest on interest, i.e., compound interest. We agree with Ford.

As always, we begin by construing the relevant statute—Civil Code section 3291. "When construing a statute, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727], quoting *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) "The words of the statute are the starting point." (*Wilcox*, at p. 977.) If the words are "clear and unambiguous," then we need look no further. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If, however, the statutory language is not clear, then "we may resort to extrinsic sources, such as the legislative history." (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 213 [105 Cal.Rptr.2d 407, 19 P.3d 1148].)

 Here, the controlling statutory language does not appear to permit the compounding of interest. Civil Code section 3291 provides in relevant part: "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment." Under the plain meaning of this language, a plaintiff is entitled to interest on *one* amount—"the judgment." (Civ. Code, § 3291.) Compounding the interest in the manner advocated by Hess, however, results in two *separate* amounts that bear interest: (1) the amount of the jury verdict, and (2) the amount of the jury verdict plus the interest accrued on the verdict up to the date of the judgment. Because section 3291 expressly states that interest shall accrue on only one amount, it precludes any compounding of interest.

Indeed, Civil Code section 3291 does not even mention the date of the judgment. Rather, the statute carefully defines the time period for accruing interest using a date *before* the judgment—the date of the section 998 offer—and a date *after* the judgment—the date the judgment is satisfied. (See Civ. Code, § 3291.) Thus, section 3291 provides for a *single* award of interest and expressly eschews any division of this award into separate prejudgment and postjudgment components.

Even if the language of Civil Code section 3291 were arguably ambiguous, the legislative history is not. Section 3291 was enacted in April 1982, as

part of Senate Bill No. 203 (1981-1982 Reg. Sess.) (Senate Bill No. 203). (Stats. 1982, ch. 150, § 1, p. 493.) During the enactment process, the Assembly amended Senate Bill No. 203 to include interest accrued under section 3291 in the judgment.[4] (See Assem. Amend. to Sen. Bill No. 203, Aug. 18, 1981, p. 3.) Soon after, the Assembly Judiciary Committee advised that the amendment failed to consider whether prejudgment interest should be part of the judgment for purposes of determining whether the judgment was more favorable than the section 998 offer. (Assem. Com. on Judiciary, com. on Sen. Bill No. 203, as amended Aug. 19, 1981, p. 1.) The committee then recommended omitting the interest from the judgment. (*Ibid.*) Six days after the previous amendment, the Assembly deleted the language adding the interest to the judgment and amended Senate Bill No. 203 to its present form. (See Assem. Amend. to Sen. Bill No. 203, Aug. 24, 1981, p. 3.) In light of this sequence of events, we are confident the Legislature did not intend to include prejudgment interest accrued pursuant to Civil Code section 3291 in the judgment. (See *People v. Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15] ["Generally the Legislature's rejection of a specific provision which appeared in the original version of an act supports the conclusion that the act should not be construed to include the omitted provision"].)

Rule 875 does not dictate a contrary result. ▮▮▮ Rules promulgated by the Judicial Council may not conflict with governing statutes. (*People v. Hall* (1994) 8 Cal.4th 950, 960 [35 Cal.Rptr.2d 432, 883 P.2d 974].) If a rule is inconsistent with a statute, the statute controls. (*In re Robin M.* (1978) 21 Cal.3d 337, 346 [146 Cal.Rptr. 352, 579 P.2d 1].) ▮▮▮ Here, the language and history of Civil Code section 3291 precludes inclusion of the prejudgment portion of the interest in the judgment for purposes of compounding the interest. (See *ante*, at pp. 530-531.) Because section 3291 controls, we conclude that the phrase "any interest" as understood in rule 875 does not include interest awarded pursuant to section 3291.

The cases cited by Hess and the Court of Appeal are inapposite. These cases involved statutes or contracts with different language and/or legislative histories than Civil Code section 3291. (See *Ehret v. Congoleum Corp.* (2001) 87 Cal.App.4th 202, 206 [104 Cal.Rptr.2d 370] [Code Civ. Proc.,

---

[4]The amended version of Senate Bill No. 203 stated in relevant part: "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which is not accepted within 30 days by the defendant and the plaintiff obtains a more favorable judgment, *the court shall, in entering judgment for the plaintiff in the action, add to the amount of damages assessed by the verdict of the jury, or found by the court, interest on the amount calculated at the rate of 10 percent per annum and calculated from the date of the service of process to the date of satisfaction of the judgment, and include the interest in the judgment as a part thereof.*" (Assem. Amend. to Sen. Bill No. 203, Aug. 18, 1981, p. 3, first italics omitted.)

§ 685.020]; *Westbrook v. Fairchild* (1992) 7 Cal.App.4th 889, 894-897 [9 Cal.Rptr.2d 277] [Code Civ. Proc., §§ 685.010 & 683.110]; *Big Bear Properties, Inc. v. Gherman* (1979) 95 Cal.App.3d 908, 914-915 [157 Cal.Rptr. 443] [Civ. Code, § 3288]; *First American Title Ins. & Trust Co. v. Cook* (1970) 12 Cal.App.3d 592, 597-598 [90 Cal.Rptr. 645] [compound interest provision in a promissory note]; *McNulty v. Copp* (1954) 125 Cal.App.2d 697, 711-712 [271 P.2d 90] [Civ. Code, § 3288].)

Finally, our ruling does not contravene the purpose behind Civil Code section 3291. Awarding simple, rather than compound, interest still creates "an incentive for recalcitrant defendants to accept reasonable settlement offers in a timely manner." (Governor's Off., Dept. of Legal Affairs, Enrolled Bill Rep. on Sen. Bill No. 203, Apr. 6, 1982, p. 2.) Indeed, even simple interest may be substantial as evidenced by the millions of dollars of interest accrued here. An award of simple interest also reimburses plaintiff "for the added cost and delay he suffers when the defendant refuses to settle the case in good faith." (*Ibid.*)

Accordingly, we agree with the Courts of Appeal in *Steinfeld v. Foote-Goldman Proctologic Medical Group, Inc.* (1997) 60 Cal.App.4th 13, 23 [70 Cal.Rptr.2d 41] and *Mendez v. Kurten* (1985) 170 Cal.App.3d 481, 487 [215 Cal.Rptr. 924]. Prejudgment interest accrued under Civil Code section 3291 is not part of the judgment, and a plaintiff may not obtain interest on this prejudgment interest.[5]

## CONCLUSION

We reverse the judgment of the Court of Appeal remanding for recomputation of the judgment, affirm the judgment in all other respects, and remand for further proceedings consistent with this opinion.

Baxter, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.**—I concur in the majority's opinion. I write separately to express a different view as to the analysis of the issue pertaining to the release. Unlike the majority, which applies the defense of mutual mistake, I would analyze this issue under the third party beneficiary theory. Although here the majority and I reach the same result on this issue, in a future case the mode of analysis could make a difference because it affects the allocation of the burden of proof.

---

[5]Because we resolve this issue on the basis of the statutory language, we do not consider whether compounding the interest violates article XV, section 1, subdivision (2) of the California Constitution.

I.

Plaintiff John Hess was a passenger in a Ford pickup truck that was hit by a car driven by Charles Phillips. Plaintiff's injuries rendered him a paraplegic. Plaintiff settled his claim against Phillips and the latter's insurance company, Continental Insurance Company (Continental), for the policy limit of $15,000. Plaintiff signed Continental's one-page release form, agreeing to "forever discharge" his claims against Phillips, Continental, and "all other persons, firms, corporations, associations or partnerships," the phrase at issue here. The Ford Motor Company (Ford) was not a party to the release.

At trial, plaintiff and the attorney who had represented him in the settlement with Phillips and Continental testified they did not intend to release Ford from liability. Continental's claims adjuster, Brad Sommers, corroborated that testimony. Sommers testified that in the settlement discussions he had with plaintiff's former attorney, the latter made clear that the purpose of plaintiff's signing Continental's release form was to "protect Phillips and Continental from future exposure," not to release Ford.

The jury returned a verdict in favor of plaintiff, finding Ford liable for 55 percent of plaintiff's injuries. It awarded plaintiff $2,701,813 in economic damages and $8.4 million in noneconomic damages. After deducting the amount plaintiff had received in settlement from other defendants, the trial court entered judgment against Ford in the amount of $6,644,155 plus interest. The Court of Appeal upheld the jury's award of damages because Ford had failed to establish that it was an intended beneficiary of the release. We granted review.

II.

Ford contends that the generic language of the standard release form discharging plaintiff's claims against "all other persons, firms, corporations, associations or partnerships" made Ford a third party beneficiary of the release. According to the majority, plaintiff had the burden of establishing "mutual mistake as his only defense to Ford's claim of third party beneficiary status." (Maj. opn., *ante*, at p. 525.) Implicit in that statement is the assumption that Ford did show it was a third party beneficiary of the release form that Phillip's insurer, Continental, had plaintiff sign. But Ford never made that showing.

When a party not specifically identified in an agreement claims third party beneficiary status, it has the burden of proving that the contracting parties intended to benefit it. (E.g., *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d

426, 436 [204 Cal.Rptr. 435, 682 P.2d 1100]; see *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584].) That burden cannot be discharged by sole reliance on the literal reading of the language in the contract. "The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement. The contracting parties must have intended to confer a benefit on the third party. (*Walters* v. *Calderon* (1972) 25 Cal.App.3d 863, 871 [102 Cal.Rptr. 89]; *Bancomer, S.A.* v. *Superior Court* [(1996)] 44 Cal.App.4th [1450,] 1458 [52 Cal.Rptr.2d 435]; *Kalmanovitz* v. *Bitting* [(1996)] 43 Cal.App.4th [311,] 314 [50 Cal.Rptr.2d 332]; *Jones* v. *Aetna Casualty & Surety Co.* [(1994)] 26 Cal.App.4th [1717,] 1724-1725 [33 Cal.Rptr.2d 291].)" (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 [87 Cal.Rptr.2d 856].)

Here, Ford was not a party to the release. In claiming it was a third party beneficiary, Ford relied solely on the standard release form's language that the release agreement between plaintiff and Continental also applied to "all other persons, firms, corporations . . . ." Ford presented no evidence that the parties to the release agreement intended its provisions to apply to Ford. Thus, Ford has not met its burden of establishing it was a third party beneficiary.

Moreover, even if we were to consider the release as evidence supporting Ford's claim to be a third party beneficiary, the properly admitted evidence overwhelmingly refutes its claim. "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible. And, '[i]n the absence of grounds for estoppel, the contracting parties should be allowed to testify as to their actual intention. . . .' [Citations.]" (*Garcia v. Truck Ins. Exchange, supra,* 36 Cal.3d at p. 437.) Here, plaintiff presented compelling evidence that he did not intend to have Ford benefit from the release agreement.

Because Ford is not a third party beneficiary here, there is no need to get into any discussion of mutual mistake by plaintiff, Phillips, and the latter's insurer, Continental.

Although the majority's analysis and mine reach the same conclusion in favor of plaintiff, that may not be the situation in another case. Anyone claiming to be a third party beneficiary, as Ford does here, has the burden of showing the contracting parties' intent to confer such a benefit. In contrast, anyone claiming mutual mistake, as plaintiff does here, has the burden of

proving that the contractual language is wrong. (See maj. opn., *ante*, at p. 525.) This difference in the burden of proof could be decisive in another case.

George, C. J., and Werdegar, J., concurred.