Filed 12/14/22  Kalthia Engineering and Construction v. Chitturi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KALTHIA ENGINEERING AND CONSTRUCTION, LLC, | D079526 |
| Plaintiff and Appellant, | (Super. Ct. No. 37-2017-00003171-CU-BC-CTL) |
| v. | |
| SWATHI CHITTURI et al., | |
| Defendants and Respondents. | |
| KALTHIA ENGINEERING AND CONSTRUCTION, LLC, | D080121 |
| Plaintiff and Appellant, | (Super. Ct. No. 37-2017-00003171-CU-BC-CTL) |
| v. | |
| RAGHUDHAR MADDALI, | |
| Defendant and Respondent. | |

CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Reversed.

AlvaradoSmith, W. Michael Hensley; Law Offices of Michael Wright and Michael Wright for Plaintiff and Appellant.

Paschall Law and Patrick D. Paschall for Defendant and Respondent Raghudhar Maddali.

No appearance for Defendant and Respondent Swathi Chitturi.

## I.

## INTRODUCTION

Plaintiff Kalthia Engineering and Construction, LLC (Kalthia) appeals from a judgment entered after the superior court sustained the demurrer of Raghudhar Maddali and Swathi Chitturi (Defendants) without leave to amend. Defendants were members of 4S Foods, LLC (4S Foods), which leased commercial space from Kalthia, and they signed a guaranty for 4S Foods's lease obligations. After 4S Foods defaulted on the lease, Kalthia sued Defendants for breach of guaranty. In a nonstatutory motion for judgment on the pleadings, Maddali contended that the guaranty defined 4S Foods, and not the Defendants, as the guarantor. Kalthia filed a first amended complaint acknowledging this fact but stating that this was a mistake in the guaranty, and Defendants demurred. The superior court ruled that, despite the fact that Kalthia had sufficiently pled allegations of mistake, the court could not consider extrinsic evidence to change the definition of guarantor as set forth in the guaranty. The court also noted that the parties had been in possession of the guaranty for over five years prior to 4S Foods's default, implying that Kalthia should have noticed and corrected the error sooner. The court sustained the demurrer without leave to amend and subsequently granted Maddali's motion for attorney fees. Kalthia separately appealed from the judgment and attorney fees order.

2

On appeal, Kalthia argues that the superior court erred by determining that it could not consider extrinsic evidence to correct the mistake in the guaranty. Kalthia further contends that it did not discover the mistake until Defendants denied in this litigation that they were personal guarantors, that whether delayed discovery applies is a factual issue, and that the court should not have decided that issue on demurrer. Only Maddali filed a respondent's brief. He maintains that the court properly declined to consider extrinsic evidence, and that Kalthia indisputably should have discovered the mistake sooner. In his separate appeal of the attorney fee order, Kalthia contends that if we reverse the judgment, we should reverse the attorney fees order, which Maddali does not dispute.

We conclude that the superior court erred by sustaining the demurrers without leave to amend. The court could have properly—and should have—considered the extrinsic evidence of mistake to assess whether to correct the guaranty, and should not have resolved the disputed factual issue of delayed discovery at the pleading stage. Because we reverse the judgment, we must reverse the attorney fees order, as well. The judgment and attorney fees order are reversed.

II.

FACTUAL AND PROCEDURAL BACKGROUND[1]

A.    *Underlying events*

Mitesh Kalthia (Mitesh) is the managing member of Kalthia, which owns commercial property in San Diego.[2] In 2010, Maddali, Chitturi's

---

[1]    Because this appeal arises from a judgment after demurrer, we take the relevant factual background from the allegations in the operative First Amended Complaint (FAC).

[2]    We refer to Mitesh by first name for clarity; no disrespect is intended.

3

husband Gandhi Davuluri, and Praveen Vellanki were looking for space to operate an Indian-themed restaurant and banquet hall. Real estate broker Manoj "Mark" Maniar brought them to meet with Mitesh.

Maddali told Mitesh that he, Davuluri's wife Chitturi, and Vellanki were forming a new California limited liability company (LLC) named "4S Foods, LLC," with the three of them as members. Mitesh told them that he would not enter into a commercial lease with a newly formed LLC without a personal guaranty from its members, because the risks were too great. Maddali, Davuluri, and Vellanki acknowledged Mitesh's concerns and agreed to provide personal guaranties.[3]

After additional meetings, the parties agreed to basic lease terms. Kalthia would be the lessor, and 4S Foods would be the lessee. Maddali, Vellanki, and Chitturi would personally guarantee the lease obligations, and Kalthia would provide or pay for certain furnishings, fixtures, and equipment. Maddali agreed to prepare the lease form, and broker Maniar agreed to prepare an addendum with additional terms.

In early March 2010, Maniar sent Mitesh a copy of the lease form (titled "Standard Shopping Center Lease and Sublease") and addendum. The lease term was five years, with a one-time renewal option. Section 1.9 of the lease form stated, "Tenant's Guarantor: ALL PARTNERS OF LLC OR PARTNERSHIP." In reviewing the lease form, Mitesh noticed that Section 1.2 did not state the landlord's name, and had extraneous language about another company. In addition, the addendum erroneously listed Mitesh,

---

[3] The FAC alleges that it was never fully explained to Mitesh why Chitturi, and not Davuluri, would be the LLC member, but that Mitesh later learned that it had to do with Davuluri's belief in astrology and horoscope readings. As we explain next, it was Chitturi as an LLC member, not Davuluri, who would provide the personal guaranty.

4

rather than Kalthia, as the landlord. The following week, Maniar sent Mitesh a different version of the lease form and addendum. Section 1.9 still stated, "Tenant's Guarantor: ALL PARTNERS OF LLC OR PARTNERSHIP." Mitesh noticed that, again, Section 1.2 did not identify the landlord and that he was listed as the landlord in the addendum. A few days later, Maniar sent a corrected lease form excerpt and addendum. Mitesh confirmed that Section 1.9 said "Tenant's Guarantor: ALL PARTNERS OF LLC OR PARTNERSHIP," that Section 1.2 correctly identified the landlord, and that the addendum had been corrected.

Mitesh then e-mailed Maniar a blank "Guaranty of Lease" form. He sent the e-mail at Maniar's request, so that Maddali could fill out the form and obtain the signatures of the guarantors (i.e., the members of 4S Foods).

In mid-March 2010, Maddali brought Mitesh a lease form that had been modified to correct the earlier errors ("Lease"). Section 1.9 now stated, "Tenant's Guarantor: ALL PARTNERS OF *LW* OR PARTNERSHIP," rather than "*LLC* OR PARTNERSHIP." Kalthia alleges that "neither of them noticed the typographical error." Before signing the lease, Mitesh asked Maddali about the personal guaranties. Maddali said that he had received the blank guaranty form and promised to fill it out and send it back within a month, once he, Vellanki, and Chitturi had signed. Kalthia alleged that, "As is customary in Indian culture, [Mitesh] accepted what he perceived to be Maddali's sincere promise to prepare and return the signed guaranty and trusted Maddali, as Maddali, Vellanki, and Davuluri—during negotiations leading up to the signing of the lease—continually assured Kalthia they would personally guarantee the lease." Mitesh signed the lease "[b]ased on Maddali's statement and the previous promises."

5

Kalthia began performing its required work on the space, as lessor, and incurred costs to do so. 4S Foods opened its restaurant in May 2010, and was very successful at first. Maddali and Davuluri continued to promise that they would send the guaranty signed by all members of 4S Foods "right away" or "very soon."

In November 2010, after repeated requests, Maddali returned the Guaranty of Lease form that he had filled out ("Guaranty"). The Guaranty identifies Kalthia as the Lessor, and 4S Foods as the Lessee. It then states, "Whereas _4S Foods, LLC hereinafter referred to as 'Guarantors' have a financial interest in Lessee, and [¶] Whereas, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guarantee of Lease." The form then explains the terms of the Guaranty. Multiple statements address both the Guarantors and the Lessee;[4] the Guarantors agree to *jointly and severally* guarantee the lease obligations; and the word "Guarantors" (plural) is used throughout the form. At the signature lines, under the word "GUARANTORS," Maddali, Vellanki, and Chitturi each hand-printed his or her name and signed next to it. They did not identify themselves as members of 4S Foods, and 4S Foods is not otherwise mentioned at the signature lines. Upon receiving the Guaranty, Mitesh confirmed that Maddali, Chitturi, and Vellanki had signed as guarantors next to their hand-printed names. He did not notice that, in the body of the form, Maddali incorrectly designated 4S Foods as "Guarantors." Kalthia alleges:

---

4       For example, the Guaranty states that the "terms of the . . . Lease may be altered . . . by agreement between Lessor and Lessee . . . without consent or notice to Guarantors," and that "Lessor shall have a right to proceed against Guarantors hereunder following any breach . . . by Lessee without first proceeding against Lessee . . . ."

6

"This incorrect designation was a mistake by Maddali as he and the other guarantors who signed the guaranty understood they were signing as individual guarantors as they had agreed during the lease negotiations and after. These individuals also knew and understood that Kalthia would not have leased the property to the newly-formed 4S Foods, LLC without their personal guaranties and they intended that Kalthia rely on their promises in signing the lease on behalf of the landlord, Kalthia Construction and Engineering, LLC, and expending thousands of dollars to perform Landlord's work as described in the amendment to the lease. Neither Maddali, Vellanki, nor Chitturi they signed the guaranty as individual guarantors until this litigation began." (Paragraph 21 of FAC.)

There appears to be an omitted word in the final sentence between "Chitturi" and "they," which Kalthia suggests on appeal was "denied."[5]

In 2011, Vellanki wanted to withdraw from 4S Foods. Vellanki, Chitturi, and Maddali signed a Membership Interest Redemption Agreement, with Davuluri signing as manager of 4S Foods. Section 4.2 states in part that "4s foods llc (*sic*) will request landlord release from personal guarantee of the current lease. Withdrawing member should sign required documents."

After Vellanki withdrew, disputes between the members began to affect the business. Nevertheless, 4S Foods extended the lease term in March 2015.

In December 2016, 4S Foods fell behind on rent and was served with a three-day notice to pay rent or quit. When it failed to pay any of the rent that was due, Kalthia sued 4S Foods for unlawful detainer. By 2017, 4S Foods was insolvent. In February 2017, the parties stipulated to a possession-only unlawful detainer judgment. After a third party claim in that proceeding was denied, the premises were restored to Kalthia.

---

5    Kalthia contends on appeal that "neither Maddali, Vellanki, nor Chitturi ever denied they signed the guaranty as individual guarantors until after litigation was commenced," emphasis omitted. This is a reasonable characterization of the allegation in the FAC.

According to the FAC, the premises had been "trashed" by Maddali, Davuluri, or their representatives. Kalthia was able to find a replacement tenant, reducing its overall claimed damages to around $200,000.

B.  *Litigation*

In January 2017, Kalthia filed a complaint for breach of written guaranty against Maddali, Chitturi, and Vellanki, seeking damages, declaratory relief, and attorney fees. Vellanki was later dismissed from the case without prejudice.

In October 2019, Maddali filed a nonstatutory motion for judgment on the pleadings, contending that the Guaranty "unambiguously defines" 4S Foods as guarantor and that the parol evidence rule bars introduction of extrinsic evidence to show otherwise. The record does not reflect any ruling on the motion.[6]

In November 2019, Kalthia filed its FAC. Maddali demurred, joined by Chitturi, and again argued that the Guaranty defined the guarantor as 4S Foods and that extrinsic evidence could not be considered. Kalthia filed an opposition, arguing that the allegations in the FAC identified admissible evidence that would establish that, due to a mistake, the Guaranty did not state the parties' true agreement, and that extrinsic evidence also would be admissible to construe ambiguity in the Guaranty. In reply, Maddali contended in part that Kalthia had not asserted a cause of action for reformation, suggesting that pleading reformation was necessary, and that the statute of limitations to do so had run.

---

[6]    Maddali lodged a copy of the motion, which we construe as a motion to augment; we grant the motion. (Cal. Rules of Court, rule 8.155(a)(1).) He states in his respondent's brief that the motion was granted, but does not cite or provide an order to this effect.

At the demurrer hearing, Kalthia's counsel argued, "Nobody is going to ask for a guaranty from a newly-formed LLC of the newly-formed LLC's obligations under the lease. It just doesn't make sense." The superior court took the matter under submission to consider the issue of the "lessee and the guarantor [being] the same." The court later entered a minute order sustaining the demurrer without leave to amend. The order states:

> "Although plaintiff has alleged sufficient facts to support an ambiguity and resulting mistake in the terms of the [G]uaranty with regard to the lease agreement [record citation], when the [G]uaranty is reviewed, the [G]uaranty defines the guarantors as 4S. Extrinsic evidence cannot change this definition. Furthermore, the parties had the [G]uaranty in their possession almost five years before the default."

The superior court entered judgment, from which Kalthia appeals. Only Maddali filed a respondent's brief. Following the entry of judgment, Maddali moved for an award of attorney fees in the superior court. The court awarded Maddali $28,360 in attorney fees. Kalthia appealed the fees order as well.[7]

## III.

## DISCUSSION

Kalthia contends that the superior court erred by concluding that extrinsic evidence would not be admissible to establish a mistake in the Guaranty, and by deciding the factual issue of delayed discovery at the demurrer stage. We agree with both contentions.[8]

---

[7] Kalthia suggests that the appeals should be consolidated, and Maddali does not oppose. We consolidate the appeals for purposes of decision. (See *Hong Sang Market, Inc. v. Peng* (2018) 20 Cal.App.5th 474, 481, fn. 1.)

[8] We need not and do not reach Kalthia's alternative argument that the Guaranty is ambiguous and that extrinsic evidence may be considered to resolve the ambiguity.

9

A.      *Applicable legal principles*

1.      *Contractual interpretation and mistake*

" 'The purpose of the law of contracts is to protect the reasonable expectations of the parties.' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268.)

"Under long-standing contract law, a 'contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) Although 'the intention of the parties is to be ascertained from the writing alone, if possible' (*id.*, § 1639), '[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates' (*id.*, § 1647)." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 (*Hess*).) Further, " '[w]hen, through . . . mistake . . . , a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.' (Civ. Code, § 1640.)" (*Hess*, at p. 524.)

Civil Code section 3399 provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (See *Hess, supra*, 27 Cal.4th at p. 524 [quoting same]; *ibid.* [in "reforming the written agreement, a court may 'transpose[ ], reject[ ], or suppl[y]' words"].)

The parol evidence rule, codified in Civil Code section 1625 and Code of Civil Procedure section 1856, " 'generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms

10

of an integrated written instrument.'" (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343.) However, "[w]here a mistake . . . is put in issue by the pleadings," the parol evidence rule "does not exclude evidence relevant to that issue." (Code Civ. Proc., § 1856, subd. (e).)[9]

2. *Standard of review on demurrer*

" 'A demurrer tests the legal sufficiency of the complaint.'" (*All of Us or None–Riverside Chapter v. Hamrick* (2021) 64 Cal.App.5th 751, 763 (*Hamrick*).) "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162 (*Novartis*).) " 'For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. . . .'" (*Hamrick*, at p. 763.)

" 'When a demurrer is sustained without leave to amend,'" and if the complaint fails to allege facts sufficient to state a cause of action, " ' "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." ' " (*Hamrick, supra*, 64 Cal.App.5th at p. 763; see *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 (*Stockton*) ["If the plaintiff has not had an opportunity to amend the complaint in response to the demurrer, leave to amend is liberally allowed as a matter of fairness, unless the complaint shows on its face that it is incapable of amendment"].)

---

9    We address the legal principles regarding delayed discovery later in this opinion.

B.    *Analysis*

    1.    *Mutual mistake*

The superior court erred in concluding that although Kalthia "alleged sufficient facts to support an ambiguity and resulting mistake" in the Guaranty, the Guaranty "defines the guarantors as 4S" and "[e]xtrinsic evidence cannot change this definition." A court may consider extrinsic evidence to address and resolve claims of mistake, and, as the court acknowledged, Kalthia pled the existence of ample evidence demonstrating that the definition of 4S Foods as Guarantors in the Guaranty is a mistake.

        a.    *Extrinsic evidence may be used to correct mistakes*

A court may consider extrinsic evidence in assessing a claim of mistake and, if applicable, in correcting such a mistake. *Hess* is instructive on this point. Hess was rendered paraplegic after an accident in a Ford pickup truck. (*Hess, supra*, 27 Cal.4th at p. 521.) He settled with the other driver and that driver's insurance company for the $15,000 policy limit, and signed a boilerplate release that encompassed "all other . . . corporations." (*Ibid.*, italics omitted.) Hess then sued Ford, which learned about the release more than four years later and obtained summary judgment based on the release. (*Ibid.*) Shortly before that summary judgment, Hess filed a separate lawsuit against the driver and insurer for reformation under Civil Code section 3399, seeking to strike the "all other" language from the release. (*Hess*, at p. 521.) The driver and his insurer admitted the mutual mistake and the court struck the language. (*Ibid.*) Hess later secured a new trial against Ford, and offered testimony from himself, his original attorney, and the claims adjuster to the effect that he had not intended to release Ford, including his attorney's statement that he had purchased the truck to use as evidence in litigation against Ford, demonstrating that he anticipated further litigation. (*Id.* at

12

p. 522.)  Ford continued to rely on the release to deny liability.  The jury reached a verdict for Hess, and the Court of Appeal affirmed.  (*Id.* at pp. 522-523.)

The California Supreme Court affirmed the verdict based on mutual mistake in the language of the release.  (*Hess, supra*, 27 Cal.4th at pp. 526.)  The Court summarized the contractual interpretation principles regarding mistake, which we have described above.  (*Id.* at p. 524.)  The Court then explained:

> "In determining whether a mutual mistake has occurred, a court may consider parol evidence.  [Citation.]  Such evidence is admissible to show mutual mistake even if the contracting parties intended the writing to be a complete statement of their agreement.  (See Code Civ. Proc., § 1856, subd. (e).)  'It is the rule that, where the writing itself, through mistake, does not express the intention of the parties who entered into it . . . and the writing does not therefore contain the real contract between the parties, the objection as to parol evidence is without merit.'  [Citation.]  Extrinsic evidence is necessary because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions."  (*Id.* at p. 525.)

The Court held that the uncontroverted evidence at trial "establishe[d], as a matter of law, that the inclusion of contractual language ostensibly releasing Ford from liability was a mutual mistake."  (*Id.* at p. 526.)

Accordingly, the superior court in this case erred by concluding that extrinsic evidence could not change the definition of the Guarantors in the Guaranty.  The court could have, and should have, considered Kalthia's proposed extrinsic evidence to ascertain whether the parties really intended for 4S Foods to guarantee its own lease obligation, or rather, whether their actual intent was for the individual members of 4S Foods to guarantee that obligation.  If the evidence established that there was a mistake, the court could revise the Guaranty to correct the definition of "Guarantors."  The court

13

apparently began this analysis, in that it indicated that Kalthia had pled sufficient allegations of mistake, but the court appeared to believe that it could not correct the Guaranty based on extrinsic evidence. This was error.

Maddali's arguments to the contrary lack merit.

First, Maddali concedes that *Hess* is "instructive for . . . delineating how courts should treat extrinsic evidence when there are allegations of mutual mistake," but contends that *Hess* does not aid Kalthia. He asserts that Kalthia "ignores the requirement that plaintiffs must timely seek reformation of contracts containing a mutual mistake" to obtain relief.

Maddali's focus on Kalthia's alleged failure to timely plead reformation is misguided. For one thing, neither *Hess*, nor the other cases that Maddali cites, *California Packing Corp. v. Larsen* (1921) 187 Cal. 610 and *In re Barton's Estate* (1950) 96 Cal.App.2d 234 (*Barton's Estate*), hold that a plaintiff must formally plead a cause of action for reformation in order to correct a mistake in a written contract. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 ["A decision, of course, does not stand for a proposition not considered by the court"].) Hess secured a reformation judgment, but in a separate case; in the Ford case, he asserted mutual mistake as a "defense to [Ford's] third party beneficiary claim . . . ." (*Hess, supra*, 27 Cal.4th at p. 516; *id.* at p. 525 [explaining that raising mutual mistake as a defense requires "only alleg[ing] and prov[ing] mutual mistake".)[10] *California Packing* and *Barton's Estate* also involved litigants in a defensive posture, and the latter did not address pleading requirements at all. (*California Packing*, at pp. 610-612 [affirming judgment for defendant in contractual dispute who raised

_____

[10] The *Hess* Court did not address timing, either, beyond noting that Hess brought his reformation action shortly before Ford's summary judgment— more than four years after the release was signed. (*Hess, supra*, 27 Cal.4th at p. 521.)

14

mistake in answer, where evidence supported trial court's finding of mutual mistake; noting it was not necessary for defendant to ask for affirmative relief by way of reformation]; *Barton's Estate,* at pp. 235, 239 [affirming decree setting trustee compensation, where beneficiaries and trustee "labor[ed] under a mistake of fact" in agreeing to lower amount; citing "general rule" that, with a material, mutual mistake, "relief will be granted to the one against whom it is sought to be enforced"].)  That a defendant is *not* required to ask for reformation does not mean that a plaintiff *must* expressly do so.

In any event, even if Kalthia were required to plead reformation, that would not foreclose relief in this appeal.  Our task is to review whether Kalthia's allegations "state a cause of action *under any legal theory*" (*Novartis, supra*, 4 Cal.5th at p. 162, italics added), and leave to amend is liberally allowed.  (*Stockton, supra*, 42 Cal.4th at p. 747.)  As we explain in later sections of this opinion, Kalthia has alleged ample evidence of mutual mistake, which would support reformation, as well as sufficient evidence of delayed discovery to preclude sustaining of a demurrer.  (§ 3399 [court may revise contract due to mutual mistake "on the application of a party aggrieved"]; see *Landis v. Superior Court* (1965) 232 Cal.App.2d 548, 555 (*Landis*) [on writ petition, directing trial court to grant leave to amend in lawsuit over stock sale seeking damages and other relief; allegations were sufficient to establish grounds for reformation; "[t]hey show[ed]: The real agreement; the agreement reduced to writing; the mistake, i.e., the defect in

15

the writing and generally how it came about"].)[11]  In other words, Kalthia has established that it could amend the FAC to plead reformation.  (*Hamrick*, 64 Cal.App.5th at p. 763.)

Second, Maddali cites *Barton's Estate* to suggest that relief for a material, mutual mistake is limited to defendants, because otherwise lack of mutual assent would preclude formation of an enforceable contract.  *Barton's Estate* did not expressly discuss contract formation (or plaintiffs, as noted above), and this restriction makes no sense; it would obviate the value of mutual mistake relief for plaintiffs.  (*Barton's Estate, supra*, 96 Cal.App.2d at p. 239; § 3399 [contract may be "revised on the application of a party aggrieved," not only defendants].)  Courts have permitted plaintiffs to pursue relief on essential issues such as price and party identity.  (See, e.g., *Tomas v. Vaughn* (1944) 63 Cal.App.2d 188, 191-192, 197 [affirming judgment for plaintiff who sought reformation of car sales contract based on mistake and fraud as to price]; *Panterra GP, Inc. v. Superior Court* (2022) 74 Cal.App.5th 697, 714, 716 [superior court improperly sustained demurrer to plaintiff's reformation claim based on mistake as to party identity].)

Third, Maddali argues that because the Guaranty "unambiguously defines" Guarantors as 4S Foods, the parol evidence rule applies to bar extrinsic evidence.  But as *Hess* makes clear, parol evidence is "admissible to show mutual mistake even if the contracting parties intended the writing to be a complete statement of their agreement."  (*Hess, supra*, 27 Cal.4th at p. 525, citing Code Civ. Proc., § 1856, subd. (e).)  Maddali's argument focuses

---

11    See *Landis, supra*, 232 Cal.App.2d at 555 ("While sometimes referred to as a 'cause of action,' reformation is merely one of several remedies for a single wrong.  Where a cause of action is based on failure to perform the intended agreement, the plaintiff may seek reformation and, in addition, damages for breach, specific performance, etc.").

16

on ambiguity, which is a separate basis for allowing parol evidence that we do not reach.  (See Code Civ. Proc. § 1856, subd. (g) [parol evidence rule "does not exclude . . . evidence of the circumstances under which the agreement was made . . . or to explain an extrinsic ambiguity"].)

Finally, additional cases that Maddali cites either focus on the ambiguity issue that we do not reach, or are otherwise distinguishable.  (See *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1130, 1132 [affirming judgment after demurrer in insurance dispute; rejecting allegations of ambiguity, where document was unambiguous, and noting § 3399 permits revision for mistake, but "bare, conclusory allegations" were "insufficient to state a cause of action for reformation based on mistake"]; *Smith v. Simmons* (E.D.Cal. 2009) 638 F.Supp.2d 1180, 1194, affd. (9th Cir. 2010) 409 Fed.Appx. 88 [granting summary adjudication to executive who signed agreement on behalf of corporation, where, among other things, it did not mention a guaranty or the executive].)  Maddali also cites cases that support Kalthia's position regarding mistake, by underscoring that it is unreasonable to have an entity guarantee its own obligation, as we discuss in the next section.  (See *Sebastian International, Inc. v. Peck* (1987) 195 Cal.App.3d 803, 809 (*Sebastian*); *Home Federal Savings & Loan Assn. v. Ramos* (1991) 229 Cal.App.3d 1609, 1614 (*Ramos*).)

b.      *Kalthia pled ample evidence of mistake*

Kalthia's FAC stated that the designation of 4S Foods as "Guarantors" in the Guaranty is a mistake, and included ample factual allegations to support this assertion.

First, Kalthia set forth allegations that the parties agreed to personal guarantees.  The FAC alleged that Mitesh told Maddali, Davuluri, and Vellanki that he would not enter into a commercial lease with a new LLC

17

without a personal guaranty from its members, and that they acknowledged his concern and agreed to provide personal guaranties. It would not have made sense for Kalthia to require 4S Foods to guarantee its own obligation. (See *Sebastian, supra*, 195 Cal.App.3d 803, 809 [affirming summary judgment for plaintiff, where corporate officer signed personal guaranty, and title next to his name on the signature line was "merely descriptive" and did "not alter his obligation"; "the guaranty would be rendered a nullity if [he] had signed only in his corporate capacity since the corporation was already bound"]; *Ramos, supra*, 229 Cal.App.3d at p. 1614 ["as in *Sebastian*, . . . to interpret the document as a guaranty by the corporate principal is objectively unreasonable because the corporations were already liable"].)[12] The FAC further alleged that when Vellanki withdrew from 4S Foods in 2011, the withdrawal agreement stated that 4S foods "will request landlord release from personal guarantee of the current lease"—showing that the LLC members believed that they were personal guarantors of the lease after they signed it. (Cf. *Hess, supra*, 27 Cal.4th at p. 526 ["The purchase of the Ford truck by Hess's attorney *after* agreeing to the settlement further confirms that Hess did not intend to release Ford"].)

Second, the FAC attached copies of the Guaranty and Lease, which both supply evidence of mistake. The Guaranty states that the Lessor "would not execute the Lease if Guarantors did not execute and deliver" the Guaranty, which is consistent with Mitesh telling Maddali and the others that he would not enter into a lease without personal guaranties. The

---

12    As *Hess* makes clear, the extrinsic evidence can illuminate the "true intentions of the contracting parties . . . ." (*Hess, supra*, 27 Cal.4th at p. 525; *see id.* at p. 527 ["the small amount of the settlement—$15,000—despite the severity of Hess's injuries strongly suggests that the Release did not cover Ford"].)

18

Guaranty also defines 4S Foods as "Lessee," and then states that "4S Foods, LLC hereinafter referred to as 'Guarantors' have a financial interest in Lessee"—meaning that, if "Guarantors" actually were 4S Foods, the Guaranty would nonsensically state that 4S Foods had a financial interest in itself. As noted above, there are other instances where the Lessee and Guarantors are discussed in the same sentence; such terms presumably refer to different entities or persons. Further, as noted, the term Guarantors is plural, which tracks with each of the LLC members providing a personal guaranty, not the LLC entity. And, in the signature block, the members signed just their names, with no mention of 4S Foods. Similarly, Section 1.9 of the Lease states "Tenant's Guarantor: ALL PARTNERS OF LW . . . ," but "LW" has no apparent meaning. The parties may have meant to say "ALL PARTNERS OF LLC" (as the earlier versions of the Lease stated), which is similar to "all members of LLC."

Third, Kalthia's allegations "explain[ed] how the mistake occurred." (*Hess, supra*, 27 Cal.4th at p. 526.) Maddali filled in a standard form for the Guaranty, and although Mitesh confirmed that all three 4S Foods members had signed when he received the Guaranty, he did not notice that Maddali had incorrectly designated 4S Foods as Guarantors in the text. The parties also used a standard form for the Lease, and neither Mitesh, nor Maddali, caught the error regarding the guarantor there, either. Even if Mitesh's actions on behalf of Kalthia were careless, "ordinary negligence will not bar a claim of mutual mistake because '[t]here is an element of carelessness in nearly every case of mistake.' " (*Id.* at 529.) Rather, "[o]nly gross negligence or 'preposterous or irrational' conduct will preclude a finding of mutual mistake." (*Ibid.* [plaintiff was "at most, guilty of ordinary negligence" in "mistakenly us[ing] boilerplate form with overly broad language"]; see *id.* at

19

p. 526 ["[w]hile the failure of both sides to catch the erroneous language under these circumstances may not be excusable, it is hardly uncommon"].)

Maddali suggests that Kalthia's allegations are inadequate, because mutual assent requires "objective . . . manifestations" and the mistake alleged in this case is "based on the parties' subjective intent regarding who should have been designated as the guarantor . . . ." We are not persuaded. In *Hess*, the Court rejected a similar argument by Ford that the trial testimony "represented the contracting parties' subjective intent." (*Hess, supra*, 27 Cal.4th at p. 528.) The Court explained that this argument "makes no sense," because intent is "necessarily subjective," and stated that "the contracting parties did not simply offer subjective opinions about the scope of the Release but related objective facts surrounding their negotiations . . . ." (*Ibid.* [testimony described "*disclosed* intentions"].) Kalthia's FAC likewise alleged objective, disclosed evidence of intent, including Mitesh's statement to Maddali and the others that he would require personal guaranties; their agreement to provide personal guaranties; the Guaranty and Lease language; and the language of Vellanki's withdrawal agreement.

2. *Statute of limitations and delayed discovery*

The superior court also erred by impliedly finding that any claim of mistake was untimely, because "the parties had the guaranty in their possession almost five years before the default." In making this finding, the court improperly resolved a disputed factual issue at the pleading stage, i.e., whether Kalthia should have discovered the mistake sooner.

a. *Additional legal principles*

"Code of Civil Procedure section 338, subdivision (d) sets forth a three-year statute of limitations for '[a]n action for relief on the ground of fraud or mistake.' That provision further states that '[t]he cause of action in that case

20

is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.' (Code Civ. Proc., § 338, subd. (d).)" (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 557, fn. 10 (*Krolikowski*).)

" 'Although the statute does not expressly provide that the claim will accrue based upon either actual *or inquiry* notice of the claimant, California courts have long construed it in such a fashion.' [Citation.] As our Supreme Court has long held, under Code of Civil Procedure section 338, subdivision (d), a 'plaintiff must affirmatively excuse his [or her] failure to discover the fraud [or mistake] within three years after it took place, by establishing facts showing that he [or she] was not negligent in failing to make the discovery sooner and that he [or she] had no actual or presumptive knowledge of facts sufficient to put him [or her] on inquiry.' [Citation.] When inquiry notice applies, 'if [a party] became aware of facts which would make a reasonably prudent person suspicious, [the party] had a duty to investigate further, and [is] charged with knowledge of matters which would have been revealed by such an investigation.' " (*Krolikowski, supra*, 24 Cal.App.5th at pp. 561-562; see *Creditors Collection Service v. Castaldi* (1995) 38 Cal.App.4th 1039, 1044 ["Code of Civil Procedure section 338, subdivision (d) specifically provides that a cause of action for relief based on mistake does not accrue until the aggrieved party discovers the facts constituting the mistake," meaning that a " 'cause of action for . . . mistake accrues, and the limitations period commences to run, when the aggrieved party could have discovered the . . . mistake through the exercise of reasonable diligence,' " citing *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701].)

A " 'plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts

to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) " 'When a plaintiff reasonably should have discovered facts for purposes of the . . . delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in this case, the allegations in the complaint . . . ) can support only one reasonable conclusion.' " (*Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1252 (*Alexander*).)

" 'A demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred.' " (*Geneva Towers Ltd. Partnership v. City and County of San Francisco* (2003) 29 Cal.4th 769, 781 (*Geneva Towers*); see *E-Fab, Inc. v. Accountants Inc. Services* (2007) 153 Cal.App.4th 1308, 1320 (*E-Fab*) [on appeal from judgment of dismissal following demurrer involving allegedly belated discovery, " 'the issue is whether the trial court could determine as a matter of law that failure to discover was due to failure to investigate or to act without diligence' "].)

b.     *Analysis*

The FAC contains allegations that Kalthia discovered the mistake during this litigation, and did not unreasonably fail to do so sooner.

Kalthia sued for breach of written guaranty in January 2017. In October 2019, Maddali filed his nonstatutory motion for judgment on the pleadings, citing the definition of 4S Foods as Guarantors in the Guaranty. Kalthia filed its FAC the following month, alleging that there was a mistake in the designation of Guarantors. The FAC asserted that when Mitesh

received the Guaranty, he confirmed that all three members of 4S Foods had signed and did not notice the error in the Guarantors designation, and that neither he, nor Maddali, noticed the error in the guaranty section of the Lease. The FAC also described other events that either confirmed that the personal guaranties were in place (Vellanki's withdrawal agreement in 2011), or gave Kalthia no reason to revisit the documents (e.g., the 5-year lease extension in 2015). Even after 4S Foods stopped paying rent in 2016, leading to the unlawful detainer proceedings, Kalthia did not necessarily have any reason to suspect that the members would dispute their personal guaranties or that they had any basis to do so. Rather, Kalthia alleged that it did not become aware that the members denied that they were personal guarantors until this litigation began—meaning that Kalthia discovered their position, and the mistake in the Guaranty, during this litigation.

These allegations, if proven, are sufficient to establish when and how Kalthia discovered the mistake, and could support a finding that Kalthia was not aware of facts that reasonably should have led to earlier discovery. (See *Fox, supra*, 35 Cal.4th at p. 807; *Alexander, supra*, 219 Cal.App.4th at p. 1252; cf. *Krolikowski, supra*, 24 Cal.App.5th at pp. 562-563 [affirming judgment for plan administrator in action contesting pension recoupment, where there was no evidence administrator was aware of facts prior to audit and recoupment process that "should have reasonably made it suspicious that [the] pension benefits had been incorrectly calculated"].) Accordingly, the superior court could not conclude as a matter of law that Kalthia's allegations of mistake were untimely, and it erred by impliedly sustaining the demurrer on timeliness grounds. (*Geneva Towers, supra*, 29 Cal.4th at p. 781; *E-Fab, supra*, 153 Cal.App.4th at p. 1320.)

Maddali's arguments on this issue lack merit.

First, Maddali contends that the FAC did not allege facts regarding the "time and manner of . . . discovery" of the mistake. We disagree. As we explained in the factual background, Paragraph 21 of the FAC alleged, in substance, that the 4S members had not denied that they signed as personal guarantors until this litigation, but that the word "denied" was omitted. We disagree with Maddali that Kalthia's discussion of such denial in its briefing amounts to improperly "rewrit[ing]" the FAC. Even if the allegation were unclear, Kalthia has established that it could provide adequate clarification by amendment. (See *Hamrick*, 64 Cal.App.5th at p. 763.)

Second, Maddali argues that "it cannot be disputed that Kalthia was well aware of facts which would make a reasonably prudent person suspicious" when it received the Guaranty, and that it should be charged with knowledge of the mistake. These facts purportedly include the failure of the 4S Foods's members to provide the Guaranty until several months into the lease term, despite Kalthia requiring personal guaranties to enter the lease; Davuluri "serving as a conduit for his wife [Chitturi] in making promises to personally guaranty (*sic*) the lease"; and the fact that Mitesh had scrutinized the Lease and its addendum, leading to "several exchanges" over the parties' names in the lease.

But Kalthia *does* dispute that it should have been aware of the mistake sooner and has pled sufficient allegations supporting its position. This is therefore an issue for a factfinder, not demurrer. (*Geneva Towers, supra*, 29 Cal.4th at p. 781; *E-Fab, supra*, 153 Cal.App.4th at p. 1320.) Further, the instances cited by Maddali simply are not indisputably suspect. Kalthia alleged that Mitesh accepted Maddali's promise to return the signed guaranty, citing "[c]ustomary . . . Indian culture" and the assurances to provide personal guaranties during negotiations—so the delayed delivery of

24

the Guaranty and Chitturi serving, and signing, as the LLC member rather than Davuluri did not necessarily call that promise into question. Nor does the fact that Mitesh requested corrections to earlier versions of the Lease mean that his failure to catch the mistake in the Guaranty was unreasonable. Mitesh did review the Guaranty, and confirmed that all three members of 4S Foods had signed. Further, the final Lease version still contained a mistake that neither side caught ("LW" instead of "LLC"). (See *Krolikowski, supra,* 24 Cal.App.5th at p. 562 [rejecting argument that plan administrator "always had *available*" the information to correctly determine the benefits].)

*North Star Reinsurance Corp. v. Superior Court* (1992) 10 Cal.App.4th 1815, cited by Maddali, is distinguishable. There, the plaintiff sought reformation of an insurance policy and the insurer asserted that the claim was time-barred, citing a letter that it had sent three years earlier that identified the policy exclusions. (*Id.* at pp. 1819-1820.) After the superior court denied summary judgment to the insurer, the Court of Appeal granted writ relief, stating that there "cannot be any factual dispute . . . that [the insured] discovered 'the facts constituting the . . . mistake' " when it received the letter. (*Id.* at pp. 1822-1823.) Here, in contrast, there is no indication that Maddali or the other members ever communicated to Kalthia that they were not personal guarantors, prior to this litigation.[13]

---

[13]   Maddali also cites *Hulsey v. Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 339 for the proposition that absent "fraud, overreaching or excusable neglect," one "who signs an instrument may not avoid the impact of its terms on the ground that he failed to read" it. *Hulsey* did not involve mutual mistake, and is otherwise inapposite. (*Id.* at p. 336 [affirming summary judgment for defendant in personal injury action, where plaintiff signed liability waiver].)

Third, Maddali contends that events after delivery of the Guaranty also should have led Kalthia to discover the mistake, such as Vellanki's withdrawal in 2011; 4S Foods's lease extension in 2015; its business difficulties, the unlawful detainer proceedings, and the trashing of the property; and events in and after January 2017, including the filing of this lawsuit. The FAC was filed in November 2019, within three years of the events in 2017 (so would still be timely), and the other factual issues cannot be resolved on demurrer. (§ 338, subd. (d); see *Geneva Towers, supra*, 29 Cal.4th at p. 781.) Further, some of these facts support Kalthia's position, or at least are consistent with it. For example, Vellanki's withdrawal agreement reflected that the members of 4S Foods still believed that their personal guaranties were in place, and the lease extension provided no reason to review the Guaranty.

As for the business difficulties experienced by 4S Foods, they were not necessarily suspect, either. Maddali contends that "Kalthia expressly admits it had suspicion the guaranties were not in place after 4S Foods breached the lease," citing Paragraph 15 of Kalthia's original complaint and page 54 of its opening brief. Neither document contains such an admission. Paragraph 15 of the original complaint discussed Kalthia's recovery of possession and asserted entitlement to relief. Page 54 of Kalthia's opening brief states (continuing onto page 55):

> "[Kalthia] only become [*sic*] aware that Maddali and Chitturi were asserting otherwise [i.e., that there was no personal guaranty] after 4S Foods defaulted and vacated the premises, once Kalthia sued on the guaranties. Prior to the breach of lease obligations, Kalthia had no suspicion that guaranties were not in place and, further, it had suffered no damages until 4S Food defaulted from its monetary obligations (which then led to its attempted recourse against the guarantors in light of 4S Foods' insolvency)."

26

Kalthia's point appears to be that, until the lease was breached, there was no reason to pursue enforcement of the Guaranty or to suspect that the personal guaranties might not be in place—not that the breach of the lease itself triggered such suspicion.

Maddali also argues that Kalthia's "retain[ing] counsel to serve the 3 day notice and/or file the UD action" should have led to discovery of the mistake, citing *Lazzarevich v. Lazzarevich* (1952) 39 Cal.2d 48. Kalthia filed the unlawful detainer action against 4S Foods directly, to regain possession of the property. It does not follow that the attorney would have been aware of the Guaranty or have had any reason to review it. (See *Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1297 [unlawful detainer actions are "of limited scope, generally dealing only with the issue of right to possession"]; compare *Lazzarevich*, at p. 50 [affirming judgment for former wife, in plaintiff's action to set aside assignment of real property interest based on his mistaken belief that they were still married; his attorney obtained the final divorce judgment, and "[o]rdinarily, a person is held to know what his attorney knows"].)

We conclude that the superior court erred by sustaining the demurrer without leave to amend, and that the judgment of dismissal must be reversed.

3.      *Attorney fees order*

Kalthia's sole contention regarding the attorney fees order is that if we reverse the judgment, we should reverse the order. Maddali does not dispute Kalthia's position, and we concur. (See *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [" 'An order awarding costs falls with a reversal of the judgment on which it is based' "].)

27

## DISPOSITION

The judgment and attorney fees order are reversed.  Kalthia shall recover its costs on appeal.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.